104 Ariz. 26 (1968)
448 P.2d 82
In the Matter of the ADOPTION OF Baby Boy KRUEGER, a Minor.
Jean STEFFEN and Barbara Steffen, Appellants,
v.
Jay S. BUNKER and Permelia Bunker, Appellees.
No. 9251-PR.
Supreme Court of Arizona. In Banc.
December 13, 1968.
Rehearing Denied January 17, 1969.
*27 Richard G. Neuheisel, Tempe, for appellants.
Rhodes, Killian & Legg, by John G. Hough, Mesa, for appellees.
LOCKWOOD, Justice:
This matter is here on a petition for review. The pertinent facts follow:
Appellants Jean and Barbara Steffen were husband and wife prior to May 13, 1964, on which date Barbara obtained a decree of divorce from Jean in the Superior Court of Maricopa County. Jean was residing apart from Barbara in Wisconsin when the divorce was granted. Two children, a girl ten and a boy nine, were the issue of that marriage. Thereafter in June of 1964, Jean returned to visit Barbara in Phoenix, cohabited with her for several weeks, and it is during this time that the child whose adoption is at issue here, was conceived. Jean returned to Wisconsin unaware of Barbara's pregnancy. Several months later, Barbara consulted with a doctor. She indicated to him that she would be unable to support the child after its birth. The doctor proposed, as one alternative open to her, that she place the child for adoption. On a subsequent visit with the doctor, Barbara expressed a desire that her child, when born, be placed for adoption. The doctor referred her to an attorney with experience in adoption procedures.
In March of 1965, Barbara consulted the attorney who had been recommended, and was informed of the legal consequences and proceedings for an adoption. She was further told that her consent to the adoption was revocable up to the time the child was placed in the custody of the adoptive parents. (See In re Holman's Adoption, 80 Ariz. 201, 295 P.2d 372 (1956)). On a return visit with the attorney, Barbara stated that she wished to carry through with the adoption as soon as the child was born. The attorney was aware that Barbara was divorced, but the evidence is in conflict as to whether she informed him who the child's father was. During this second visit, Barbara signed a "Consent to Adoption" of her yet unborn child. Evidence (adduced at the hearing on the Steffen petition to set aside the interlocutory decree of adoption) discloses that her signature was acknowledged after the child was born. The consent was executed in the name of "Barbara Krueger"; it recited that the names of the adoptive parents were unknown to Barbara and that she would never know who the adoptive parents would be. There is an affidavit executed by Barbara which states that she used an alias "* * * to prevent embarrassment to any of the parties connected with this adoption". Testimony of the attorney was to the effect that Barbara used an alias so that "the father would not find out about the child". There was no further communication between Barbara and her attorney during the time after execution of the consent and approximately a week after the child's birth.
On May 17, 1965, the child was born in Mesa Lutheran Hospital, Mesa, Arizona. Barbara signed an "Authorization for Release of Newborn Infant" shortly after the birth which empowered the hospital to release the child to the custody of the attorney. Barbara was discharged from the hospital, and left without the child. The attorney received the child at the hospital, and gave it over to the custody of the adoptive parents, Jay and Parmelia Bunker, appellees herein. The consent which was signed by Barbara in April preceding the birth was acknowledged by notarial act on May 18, 1965.
Shortly thereafter, Barbara changed her mind and wrote a letter to the attorney who had arranged for the adoption which stated that she wanted her child back, and asked whether he could do anything for her. He replied that it was, regrettably, too late for her to revoke her consent.
*28 Barbara then communicated with her former husband in Wisconsin, and informed him of the child and the adoption. He returned to Phoenix several weeks later, and on July 28, 1965, Jean and Barbara remarried. On August 12, 1965, Jean by affidavit acknowledged the paternity of the child, and filed the affidavit with the Bureau of Vital Statistics.
Prior to these events, the Bunkers had filed their "Petition for Leave to Adopt Minor Child" on May 21, 1965. The petitioners alleged, inter alia, that the father of the child was unknown, but the mother, Barbara Krueger, had given her written consent to the adoption.
A hearing on the petition was held in the Superior Court on September 7, 1965 at which time the court entered its interlocutory order of adoption as prayed for by the Bunkers. Neither Barbara nor Jean was present at the hearing in person or by counsel, nor had they been given notice of the hearing.
The interlocutory order recited that the child, Baby Boy Krueger, had been and was in the custody of the adoptive parents since May 20, 1965; that the father of the child was unknown; that a duly acknowledged consent to adoption had been signed by the mother, Barbara Krueger; that all of the allegations of the petition were true; and that the best interests of the child would be subserved by his being adopted by the Bunkers.
In November, 1965, Jean Steffen moved to set aside the decree of divorce which had been entered on May 13, 1964; Barbara did not contest the motion. The Superior Court, on November 15, 1965, entered its order which stated:
"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that that certain decree of divorce settled and approved * * * is hereby declared to be a nullity and the same is ordered vacated and set aside nunc pro tunc."
The words "nunc pro tunc" were stricken from the order by the Judge entering the order.
On November 22, 1965, Jean Steffen filed a petition to set aside the interlocutory order of adoption wherein he stated that he was the husband of Barbara and the father of the child born to Barbara and had not consented to the adoption. The order declaring the divorce to be a nullity was attached as an exhibit to the petition. Barbara subsequently joined her husband as petitioner. Jean and Barbara contended that the consent executed by Barbara was invalid as being the product of fraud and duress, and that without having received notice of the hearing, the interlocutory order of adoption was void and of no effect.
The respondent adoptive parents having answered contesting the petition, all parties appeared in court, and the case came on for hearing on June 10, 1966. After hearing testimony on the questions and issues raised by the petition, the court took the case under advisement, and on June 14 ordered that the Steffen's petition be denied, finding that
"* * * the consent of Barbara Steffen is valid and the Court further finding that it is in the best interests of the minor child to Order the Adoption, * *."
On July 21, 1966 the court filed findings of fact as required by § 8-104, A.R.S. and conclusions of law based thereon; which read as follows:
"FINDINGS OF FACT
"1. That Barbara Steffen gave birth to the subject baby boy at the Mesa Lutheran Hospital in Mesa, Arizona on May 17, 1965.
"2. That the subject minor child was conceived and born out of wedlock.
"3. That Barbara Steffen executed in writing a consent to the adoption of said minor child by the Bunkers, both before and after the birth of the said child. That Barbara Steffen expressed her intent to consent to such adoption orally before and after the birth of said child. That Barbara Steffen left the hospital where her child was born on May 17, 1965, without said child and with an intent that such child be adopted by Jay S. and Permelia T. *29 Bunker. That Jay S. and Permelia T. Bunker did on the 21st day of May, 1965 file a petition for the adoption of said minor child.
"4. That no male person acknowledged parentage of said minor child prior to the filing of said petition for adoption.
"5. That an Interlocutory Order of Adoption of said minor child by Jay S. and Permelia T. Bunker was duly and properly entered on September 7, 1965.
"6. That no person contested or objected to the entry of the said Interlocutory Order of Adoption.
"7. That said minor child had resided in the home of Jay S. and Permelia T. Bunker since May 20, 1965.
"8. That while residing in the Bunker home and in the custody of the said Bunkers, said minor child has
"(A) Received the usual, customary, necessary and proper medical attention;
"(B) Been properly fed, clothed, tended and cared for;
"(C) Received appropriate and abundant parental and family love, affection and attention;
"(D) Developed and grown in a normal healthy manner.
"9. That the Bunker home is physically suitable for the health, comfort and welfare of the Bunkers, their natural children and the subject minor child.
"10. That the Bunkers are financially able to adequately care for and provide the necessaries and the comforts of the average American home for themselves, their natural children and the subject minor child.
"11. That Jay S. and Permelia T. Bunker are physically and emotionally capable of properly rearing the subject minor child.
"12. That the marriage of Jay S. and Permelia T. Bunker has been, since its consummation, a stable, lasting and enduring marriage.
"13. That the interests of the subject child will be promoted by his being adopted by Jay S. and Permelia T. Bunker.
"14. That the Petitioners Jean and Barbara Steffen cohabited together for a period of approximately six weeks without being married.
"15. That the Petitioner, Jean Steffen, in 1958 or 1959 left his wife and children for a period of fourteen days without just cause.
"16. That Petitioner, Jean Steffen in September 1963 left his wife and children in a destitute condition without just cause, was thereafter divorced by his wife, Barbara, in May of 1964 and failed to provide for his family for a period in excess of twenty-two months.
"17. That Jean Steffen is a neurotic person with a chronic anxiety reaction.
"18. That Barbara Steffen has a chronic anxiety reaction.
"19. That Jean Steffen has attempted suicide.
"20. That Jean Steffen has committed physical violence upon his wife to the extent that his wife has been in fear of her life and for the safety of her children.
"21. That the marriage of Jean and Barbara Steffen has been an unstable marriage terminating in divorce."
"CONCLUSIONS OF LAW
"1. That the consent only of Barbara Steffen was necessary for the adoption of the minor child, the subject of these proceedings.
"2. That Barbara Steffen gave her consent to the adoption of said minor child by Jay S. and Permelia T. Bunker.
"3. That the Interlocutory Order heretofore entered for the adoption of said minor child by Jay S. and Permelia T. Bunker is legal and valid and all proceedings in the above entitled cause leading up to the entry of said Interlocutory Order are in proper form and order.
"4. That the interests of the subject child will be promoted by his being adopted by Jay S. and Permelia T. Bunker.
"5. That the consent of Jean Steffen is not necessary for the adoption of said child by Jay S. and Permelia T. Bunker.
*30 "6. That the consent of Barbara Steffen is not necessary for the adoption of said child by Jay S. and Permelia T. Bunker.
"7. That it is in the best interests of the subject minor child to order his adoption by Jay S. and Permelia T. Bunker."
The Court of Appeals held that (1) the child was born out of wedlock; (2) it was unnecessary that the natural father consent to the adoption; (3) the purported consent executed by Barbara Steffen was valid; (4) that the natural parents were not entitled to notice of the interlocutory hearing; and (5) that the trial court did not abuse its discretion in determining that the best interests of the child were served by its adoption.
Barbara Steffen contended that her purported consent was invalid as induced by fraud and duress and she was therefore entitled to notice of the interlocutory hearing. The trial court and the Court of Appeals, were both of the opinion that the consent was validly executed.
We accepted the petition for review for the purpose of correcting the holding of the Court of Appeals that the consent of the natural parents may be "dispensed with" whenever the trial court finds that it is in the best interests of the child to order the adoption. Section 8-104 A.R.S. (1956) states:
"An order of adoption may be entered without the consent of the parent or legally appointed guardian when, after hearing, the court determines that the interests of the child will be promoted thereby. In such cases, the court shall make written findings of all facts upon which its order is founded."
However, such a determination is permissible only when, in the absence of consent, the persons whose consent is necessary pursuant to § 8-103 A.R.S. (1956) have been served with notice of the interlocutory hearing as required by § 8-105 A.R.S. (1956), or have waived such notice.
We are of the opinion that the purported consent executed by Barbara Steffen before the birth of the child was voidable for the reason that the statutes contemplate adoption only of a child in being and separate from its mother. A voidable consent may be ratified by a subsequent act which sufficiently manifests a present intention to consent to the adoption of the child. The authorization and release executed by Barbara Steffen after the child was born was sufficient ratification of her prior voidable consent. For this reason, Barbara Steffen was not legally entitled to notice of the interlocutory hearing of September 7, 1965.
The Steffens' appearance in court, during the interlocutory period, on their petition to set aside the interlocutory order was an appearance for all purposes which gave the parents their day in court and preserved the court's jurisdiction to proceed in its determination of the adoption regardless of whether consent to the adoption was required. The provision of § 8-103 A.R.S. (1956) having been satisfied, it was within the Court's discretion pursuant to § 8-104 to grant the order of adoption based upon a finding that the best interests and welfare of the child would be subserved thereby.
Section 8-104, A.R.S. specifically empowers the Court to enter an order of adoption without the consent of the parent or guardian, when, after hearing, it determines "the interests of the child will be promoted thereby." This has been the long standing rule in this state. See In re Clough, 28 Ariz. 204, 236 P. 700 (1925); In re Adoption of Luke, 3 Ariz. App. 327, 414 P.2d 176 (1966). The record in this case includes a transcript of the hearing contesting the adoption, as well as the depositions of both natural and both adoptive parents. The trial judge had the opportunity of observing the witnesses, as well as hearing testimony. There was ample evidence to support his finding and we cannot say he abused his discretion in making the order of adoption.
We are here constrained to comment with disfavor upon the method of placement of the child in this case, which does violence to the spirit, if not the letter of our *31 adoption laws. Section 8-511, A.R.S. gives a licensed welfare agency the authority to place a child in an adoptive home. Section 8-103 also provides for a direct relinquishment by the parent.
In the instant case the unmarried mother, confused and disturbed by her unexpected pregnancy, first consulted a doctor, who suggested adoption as an alternative to keeping the child at the expense of embarrassment and intolerable financial pressures. Second, the doctor referred her to a lawyer to discuss the legal necessities of adoption. The lawyer acknowledged he represented the interests not of the mother but of the adoptive parents, although he did advise the mother of her legal rights. There is no evidence that anyone attempted to give counsel to the mother which might have eased her anguish and helped her to realized that her decision for adoption, after full discussion and consideration of all alternatives, was the best solution.
That portion of the opinion of the Court of Appeals which held that the consent of the natural parents could be dispensed with, as hereinabove noted, is hereby disapproved. The final order of adoption entered in the Superior Court of Maricopa County is affirmed.
UDALL, V.C.J., concurs.
STRUCKMEYER, Justice (concurring in the result).
I express grave misgiving concerning the adoptive procedures disclosed by the circumstances of this case. The attorney for the adopting parents was aware at the time of the Interlocutory Hearing of Adoption that Jean Steffen was attempting to obtain the custody of his son. But the record does not disclose that the court was advised that this was other than the usual cursory and informal hearing accompanying the adoption of an unwanted child. The natural father has a legal right which could be and was affected by the adoption proceedings. He should have been given notice and the opportunity to be heard in order to avoid the taint of lack of procedural due process.
However, the Steffens' petitions to set aside the Interlocutory Order of Adoption later presented Jean Steffen with the opportunity to assert his right which had previously been denied him. I do not believe, therefore, that the adoption should be set aside for procedural deficiencies.
I do not find under the facts of this case that the court below abused its discretion in denying the Steffens' petitions to set aside the Interlocutory Order of Adoption. I would place the burden squarely upon the father of an illegitimate child to buttress his right of custody by a clear showing that the child will be raised in a stable environment. While others might not agree with the trial judge who viewed the evidence as favorable to the adoption, he has a certain latitude, although circumscribed, within which he may exercise a sound judicial discretion.
The Decree of Adoption should be affirmed.
BERNSTEIN, Justice (dissenting).
This court has been asked to decide two important questions: one, whether the father of a child born out of wedlock has any right to notice of litigation affecting custody of his offspring when the mother has voluntarily consented to the child's adoption; and two, whether there has been sufficient showing of Jean Steffen's unfitness to justify severing the legal relationship of parent and child.
In many jurisdictions, the father of a child born out of wedlock has been the forgotten figure in the illegitimacy triangle. The mother and child have been nurtured and protected by both courts and legislatures. The father, on the other hand, has been subjected to stringent obligations with very few corresponding rights.
Our legislature, cognizant of this inequity, provided some degree of protection to the out of wedlock father in custody and adoption proceedings. See A.R.S. § 8-103, subsec. A, par. 1(b). This court *32 has also recognized the father's legal interest in his natural child. See Caruso v. Superior Court etc., 100 Ariz. 167, 412 P.2d 463 (1966).
I am of the opinion that Jean Steffen should have been given notice of all proceedings affecting custody of his infant son. This conclusion has found support in the recent leading case of In Re Brennan, 270 Minn. 455, 134 N.W.2d 126 (1965). In that case an illegitimate girl was conceived as a result of the physical alliance of Mohummed Sadden, a Moslem, and Miss Linda Brennan, a Protestant. The father made several unsuccessful proposals of marriage. After the child was born, Miss Brennan voluntarily consented to the child's adoption with a child placement agency. The natural mother, herself unable to raise the child, objected to the father raising the child on both religious and personal grounds. The agency and the child's mother contended that the natural father had no legal interest in his daughter.
The Minnesota Supreme Court held that the father had a right to be heard, present evidence, and cross examine witnesses in any hearing affecting the custody of his child. The court stated:
"A sincere concern which springs from a sense of responsibility to his own flesh and blood is reason enough to permit him to be heard. Although this policy may present some risk for the adoption process, it should nevertheless be permitted where the claim is asserted promptly and under circumstances to minimize the risk of trauma to the child or to the adoptive parents which would accompany judicial acceptance of his assertion." 134 N.W.2d at 132.
The court held that the natural father could institute proceedings in the nature of an equitable action to establish his right to have notice of proceedings taken with reference to the adoption of his child.[1]
Mr. Steffen demanded custody of his child from the attorney handling the adoption shortly after his return to Arizona in June of 1965. At the time of his demand, the child had been in the Bunkers' home less than one month. His demand antedated the Interlocutory hearing by almost two and one-half months. Despite these new and important circumstances, the Court was not advised of Mr. Steffen's claim over his child and Mr. Steffen was not notified of the Interlocutory hearing. In my opinion, this lack of notice constituted sufficient error to set aside any adoption decree which originated out of this defective hearing. We feel that the subsequent hearing on the Steffens' petition to set aside the interlocutory decree was insufficient to erase this earlier defect of notice.
There is another important reason for setting aside the adoption decree of the Superior Court. In Caruso v. Superior Court etc., 100 Ariz. 167, 412 P.2d 463 (1966) our Court was faced with a problem similar to the one posed in the instant case. In that case, the natural mother relinquished her child to the Catholic Social Service pursuant to A.R.S. § 8-512, subsec. B. The father desired to obtain custody of the child. The Society, upon learning of the father's interest, sought a dependency hearing. A hearing was called, whereupon the juvenile court found that the infant in question was dependent. The Superior Court determined that a further hearing should be held to decide whether the father's *33 rights should be severed so that the child could be placed for adoption. The father filed a writ of prohibition in this Court. In sustaining the father's petition, we said:
"As a natural father, petitioner is entitled to the care, custody and control of his child against all others except the mother (citations omitted). She, of course, relinquished her rights. We will recognize petitioner's right to his child until his unfitness clearly appears * * *" (Emphasis added) 100 Ariz. 167 at 173, 412 P.2d 463 at 467.
There was no finding by the Superior Court that Jean Steffen was an unfit person. In my opinion, this specific finding was essential before the parental tie could be severed by the Court.
I concur with the majority opinion's analysis of private placement. I believe that this entire case would have been avoided if the placement had been handled by an agency. In a study conducted by the Illinois Department of Children and Family Services, it was stated:
"In independent adoption, however, in addition to the lack of essential service for the unmarried mother, there often is also a violation of her rights. The attorney and the physician usually work for the adoptive parents and no one really represents the natural mother or the child. If the unmarried mother changes her mind in independent adoption, the attorney often pressures her rather than changing the plans. An agency, on the other hand, can help her make alternative plans * * * Whereas only one of the three parties involved is the attorney's client, the agency serves all three." Chaskel, The Unmarried Mother: Is She Different?, in ADOPTION OUTLOOK ILLINOIS  1966, at 55.
In proceedings of adoption, our courts have the obligation of determining the best interests of the child. We must therefore weigh the merits and demerits of both contestants before awarding custody. I believe that the Superior Court failed to attach sufficient weight to the blood tie which binds a child to his father. This bond normally promotes a child's welfare in terms of love and security. The bond extends both vertically (between parent and child) and horizontally (between brother and sister). The decision today permanently severs this bond.
I am of the opinion that adoption is second best and a step which should be sanctioned only after the natural parental process has broken down, either by death or desertion of the parents or improper care of the child. Jean Steffen testified that he is ready and willing to provide a home for his child and that he loves his child. Without a finding that he is unfit, he should be given the custody for which he petitions.
I would therefore reverse the Court of Appeals and order that the decree of adoption be vacated.
McFARLAND, C.J., concurs.
NOTES
[1] In 50 Minn.L.Rev. 1071 (1965-1966), an excellent law review note was recently published which discusses the question of whether a natural father has any legal interest in the disposition of his child subsequent to relinquishment by the natural mother. The author believes that

"* * * the interests of the child, the natural mother, and the agencies and adoptive parents should not totally eliminate the father. Any privilege granted to him for a hearing need not unduly interfere with the existing rights of others in the adoption process." 50 Minn.L.Rev. at 1084. Several leading state courts have adopted the Brennan rationale. See In Re Guardianship of C., 98 N.J. Super. 474, 237 A.2d 652 (1967); Mixon v. Mize, 198 So.2d 373 (Fla.D.Ct.App. 1967); In the Matter of Mark T., 8 Mich. App. 122, 154 N.W.2d 27 (1967).
See also 37 A.L.R.2d 882.