## In re the ADOPTION of the INFANT CHILD BAXTER,

**Joseph and Jana Robbins, Appellants (Defendants below),**

v.

**Stephanie Baxter and Decoby Askew, Appellees (Plaintiffs below).**

No. 29S02–0303–CV–117.

Supreme Court of Indiana.

Dec. 9, 2003.

Charles P. Rice, South Bend, IN, Attorney for Appellant.

Yvonne F. Watkins, Indianapolis, IN, Attorney for Appellee.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 29A02–0202–CV–107.

SULLIVAN, Justice.

After signing consents to the adoption of their baby, the biological parents attempted to withdraw their consents on grounds that they had not been properly notarized in accordance with the provisions of the Indiana adoption statute. We hold that if the written consent is not properly notarized, the validity of the consent may nevertheless be satisfied by evidence that the signatures are authentic and genuine in all respects and manifest a present intention to give the child up for adoption.

### Background

This controversy arises out of the contested adoption of an infant. Stephanie Baxter became pregnant when she was 17 years old. Decoby Askew, the biological father, was 18 years old. Through her mother, Karen Baxter, the still-pregnant biological mother sought out the prospective adoptive parents, Joe and Jana Robbins.

The maternal grandmother and Jana Robbins were co-workers. The biological mother, the biological father, and the maternal grandparents not only knew of the adoptive parents' desire to adopt a child but also knew that the adoptive parents were fearful of adoption proceedings because of two negative experiences of families in their church where bonding had occurred between prospective adoptive parents and a child and then the adoption was not finalized.

The adoptive parents hired attorney Raymond Adler to assist them in drafting a petition for adoption ("Petition") and adoption consent forms ("Consents"). The Petition and the Consents were given to the biological parents and maternal grandparents for review and comment. After the review of the documents by the biological parents and maternal grandparents, the adoptive parents were advised that the documents contained misspellings of names and that such misspellings needed to be corrected. The misspellings were corrected and the biological parents and maternal grandparents invited the adoptive parents to dinner at the home of the maternal grandparents so that the Consents could be signed and the adoption proceed.

The biological mother, the biological father, and the maternal grandparents signed the Consents on or about July 24, 2000. Joe Robbins took the already-signed Consents to the Hamilton County Sheriff's Department where a Notary Public, Kathy J. Gordon, notarized all of the Consents. But, as noted above, the Consents had already been executed; none of them were actually signed in the Notary's presence.[1]

Attorney Adler then filed the Petition along with the Consents in the Hamilton Superior Court on August 10, 2000. On August 15, 2000, the Court appointed the adoptive parents the guardians of the unborn child.

All of the foregoing took place while the biological mother was still pregnant. In early September, the adoptive parents were contacted by the maternal grandmother who advised them that the biological mother was going into labor. The adoptive parents went to the hospital and on September 7, 2000, the baby was born.

At the hospital, the biological parents delivered the infant Baxter into the custody of the adoptive parents. (The trial court found that a video made at the hospital showed that these events occurred knowingly and voluntarily.)

On or before September 20, 2000, the biological mother and the maternal grandmother contacted the adoptive parents to revoke their consent and reclaim custody of the infant.

On October 17, 2000, the biological mother, biological father, maternal grandparents, and paternal grandparents filed with the court papers denominated "Combined Emergency Motion to Set Aside Guardianship And Custody Order Pending Adoption And Revocation Of Consent To Adopt, Petition For Habeas Corpus, Petition To Dismiss Adoption Petition, And Motion To Transfer." The Motion to Set Aside alleged that "the pre-birth consents are voidable pursuant to Indiana law."

On June 29, 2001, the Hamilton Superior Court held a hearing to determine whether the Consents were valid. The court found that the biological parents and the mater-

---

1. Ind.Code § 33–16–2–2(a)(6) provides in part that a notary shall not "acknowledge the execution of ... an instrument unless the person who executed the instrument: (i) signs the instrument before the notary; or (ii) affirms to the notary that the signature on the instrument is the person's own." Notaries are reminded of their obligations in this regard.

nal grandparents had knowingly and voluntarily signed the Consents. However, the court also found that the signatures of the biological parents and maternal grandparents had not been executed in the presence of a notary public as required by Ind.Code § 31–19–9–2 and that, under Ind. Code § 33–16–2–2, the Consents of the biological parents and maternal grandparents had been improperly notarized. Based on this evidence, the court concluded that the Consents signed by the biological parents and maternal grandparents were not properly executed and therefore were of no force or effect. The court certified its ruling for Interlocutory Appeal.

The Court of Appeals affirmed. *In re Adoption of Baxter,* 778 N.E.2d 417, 422 (Ind.Ct.App.2002); *transfer granted* 792 N.E.2d 41 (Ind.2003) (table).

### Discussion

■ "A proceeding for the adoption of a child is statutory...." *Johnson v. Smith,* 203 Ind. 214, 176 N.E. 705, 706 (1931). The General Assembly has set forth the statutes governing adoption in article 19 of title 31 of the Indiana Code. We will refer to this article as the "Adoption Code." There is no debate but that the Adoption Code requires the written consent of each of the biological mother and father for the adoption to proceed here. Ind.Code §§ 31–19–9–1 & 10–6(1)(B).[2] What is at issue is whether the required written consents executed by the biological parents and maternal grandparents were valid in the face of the following provision of the Adoption Code:

The consent to adoption may be executed at any time after the birth of the child either in the presence of:

(1) the court;

(2) a notary public or other person authorized to take acknowledgments; or

(3) an authorized agent of:

(A) the division of family and children;

(B) a county office of family and children; or

(C) a licensed child placing agency. Ind.Code § 31–19–9–2. We will refer to this provision as the "Consent Statute."

The Consent Statute is implicated in this case because, while the Consents bear the signature of a notary public, the parties acknowledge that none of the biological mother, the biological father, or the maternal grandparents were in the presence of the notary public when she notarized the Consents. Nor were the Consents executed in the presence of any of the other five entities listed in the Consent Statute.

The biological parents argue that the Consent Statute sets forth a mandatory and exclusive regimen for executing consents to adoption. Because the Consents were not executed in the presence of any of the entities listed in the Consent Statute, they contend that the Consents were not valid and were void *ab initio.* They buttress their argument by restating the long-standing principle that because the Adoption Code is in derogation of the common law, it must be strictly construed in favor of the rights of natural parents.[3]

The adoptive parents contend that the failure of the Consents to meet the specifi-

2. The Consent Statute was recodified at Ind. Code §§ 31–19–9–2 in P.L.1–1997, § 11. Previously, it had had been codified at Ind.Code § 31–3–1–6. Prior to the enactment of the Indiana Code in 1971, the Consent statute appeared at Burns Code § 3–120.

3. *See Emmons v. Dinelli,* 235 Ind. 249, 133 N.E.2d 56 (1956); *Rhodes v. Shirley,* 234 Ind. 587, 129 N.E.2d 60 (1955); *Johnson v. Cupp,* 149 Ind.App. 611, 274 N.E.2d 411, 413 (1971); *In re Adoption of Chaney,* 128 Ind. App. 603, 150 N.E.2d 754 (1958).

cations set forth in the Consent Statute do not render the Consents invalid but only deny the Consents presumptive validity. Because the Consent Statute says that consents "may" be executed—rather than "must" be executed—in the presence of the specified entities, the adoptive parents argue that they are permitted to employ additional evidence of the Consents' validity. Furthermore, they argue that the biological parents' admission that they signed the Consents, combined with the trial court's finding that the Consents were signed knowingly and voluntarily, confirms the validity of the Consents.

## I

The most important precedent for our decision in this case is the ten-year-old majority opinion of the Court of Appeals in *In re Adoption of H.M.G.*, 606 N.E.2d 874 (Ind.Ct.App.1993). Like this case, the biological mother in *H.M.G.* sought to revoke her executed consent to adoption. Also like this case, the mother's consent had been executed prior to the birth of the child. But unlike this case, there was no claim that the consent had not been executed in the presence of one of the six entities specified in the Consent Statute.

The biological mother in *H.M.G.* argued that her consent was invalid because the Consent Statute clearly required that the required consent be executed after the birth of the child. The Court of Appeals held that while that was the general statutory scheme, a consent executed prior to birth could be "ratified" by conduct after birth and if so ratified, became binding. The court said:

> [The Consent Statute] unambiguously provides "[a] consent to adoption may be executed at any time after the birth of the child [in the presence of named parties]." The use of the word "may" does not refer to whether or not a parent executes a consent. In the first instance a written consent must be executed before an adoption can be legal. The word "may" refers to when the consent to adoption is executed, i.e. before or after the child is born. The timing of the execution of the consent is clearly circumscribed by the phrase "any time after the birth of the child." There is no doubt the statute contemplates execution of the consent after the birth of the child; any other interpretation renders the clearly qualifying phrase meaningless. Under the statute, if consent is given it must be given after the birth of the child to insure such consent is a fully deliberative act on the part of the biological parent.

> We disagree, however, with [the biological mother's] contention that failure to conform to the statute renders a consent void ab initio. We find the intent of the statute, which is designed to provide an equitable adoption procedure by protecting the rights of the adoptive parents and the child as well as those of the biological parents, is best served by finding the consent voidable. A voidable consent is ratified by subsequent action. In the case of a pre-birth consent, such consent is ratified by a post-birth act which sufficiently manifests a present intention to give the child up for adoption.

*H.M.G.*, 606 N.E.2d at 874 (footnote and citation omitted). The court went on to cite in support of its position virtually identical cases involving virtually identical statutory language from Arizona, Florida, and New York that had reached the same result. *Id.* at 876 (*discussing In re Adoption of Krueger*, 104 Ariz. 26, 448 P.2d 82 (1968); *In re Adoption of Long*, 56 So.2d 450 (Fla.1952); and *Anonymous v. Anonymous*, 139 A.D.2d 189, 530 N.Y.S.2d 613,

617 (1988)).[4] The court concluded that the post-birth conduct of the mother in *H.M.G.* constituted ratification.

In deciding the case before us, the Court of Appeals was of the opinion that its conclusion in *H.M.G.* as to the timing of an adoption consent did not require the same result with regard to whether the consent had to be executed in the presence of one of the entities specified in the Consent Statute. *Baxter,* 778 N.E.2d at 421–22. As noted *supra,* the court went on to hold that a consent that is not executed in the presence of one of the entities specified in the Consent Statute, "unlike a consent given before the birth of a child, is void and not merely voidable." *Id.*

Given the plain language of the Consent Statute, we are hard pressed to see how we can have a different rule for consents given before birth and consents not executed in the presence of one of the specified entities. Again, the Consent Statute reads: "The consent to adoption may be executed at any time after the birth of the child either in the presence of [any one of the six specified entities]." If a consent not executed in the presence of one of the specified entities cannot be valid, we see no way to read this language to say that a consent given before birth can be valid.

■ We believe *H.M.G.* was correctly decided and its rule controls the outcome here. The Consent Statute requires the biological parents to give their written consent to an adoption after the birth of the child. *H.M.G.* holds that if the written consent is given prior to birth, that requirement may nevertheless be satisfied by "a post-birth act which sufficiently manifests a present intention to give the child up for adoption." *H.M.G.,* 606 N.E.2d at 874. The Consent Statute requires the written consent to be executed in the presence of any one of six specified entities. Consistent with the rule of *H.M.G.,* we hold that if the written consent is not executed in the presence of any one of six specified entities, the validity of the consent may nevertheless be satisfied by evidence that the signatures are authentic and genuine in all respects and manifest a present intention to give the child up for adoption. (In reaching this conclusion, we note that ten years have past since *H.M.G.* and it is likely that legislative acquiescence has set in. A decade's worth of Indiana adoptions have occurred where the parties' expectations may well have been set based on *H.M.G.'s* holding.)

## II

■ In this case, the Consents did not conform to the requirements of the Consent Statute because they were not executed in the presence of any one of six specified entities. The trial court held that this rendered the Consents invalid and void. However, as discussed above, the validity of a consent may be satisfied by evidence that the signatures are authentic and genuine in all respects and manifest a present intention to give the child up for adoption. The trial court made no explicit finding in this respect.

There appears to be sufficient evidence in the record to warrant returning this case to the trial court for a determination as to whether the signatures are authentic and genuine in all respects and manifest a

---

4. The *H.M.G.* court did not discuss *Ex Parte Sullivan,* 407 So.2d 559 (Al.1981), where the Alabama Supreme Court, construing the *Indiana* Consent Statute, held invalid a biological mother's consent to adoption both because it was executed prior to birth and because it was not executed in the presence of any of the entities specified in the Consent Statute.

Likewise, the parties to and the Court of Appeals in this case also do not mention *Sullivan.*

present intention to give the child up for adoption. For example, the trial court found that the biological mother, biological father, and maternal grandparents knowingly and voluntarily signed the Consents. The biological parents do not appear to have contested that they intended to consent to the adoption of their unborn child at the time that they signed the Consents.

Given this evidence of record, we remand this case to the trial court for a determination of whether the Consents are authentic and valid even though they were not executed in the presence of any one of six entities specified in the Consent Statute.

### Conclusion

The judgment of the trial court is reversed. This case is remanded to the trial court for further proceedings consistent with this opinion.

SHEPARD, C.J., DICKSON, and BOEHM, JJ., concur.

RUCKER, J., dissents with separate opinion.

RUCKER, Justice, dissenting.

Were we writing on a clean slate, I would take the position that the Adoption Code evidences an intent that a natural parent cannot consent to an adoption prior to the birth of the child. As Judge Buchanan pointed out years ago:

> [Pre-birth] consents fail to allow for one of nature's strongest instincts. Who knows what the reaction will be of a mother once she sees *her* baby? Does

the view of the majority that such a consent is valid allow for maternal instinct? To deny the mother's natural desire to keep her baby is in derogation of the purpose of our statute to preserve the natural family relationship to the fullest extent possible.

*Johnson v. Cupp*, 149 Ind.App. 611, 274 N.E.2d 411, 418 (1971) (Buchanan, J., dissenting) (emphasis in the original) (interpreting prior version of Adoption Statute and holding "absent express statutory provision or judicial interpretation to the contrary, the consent signed by respondent . . . was not invalid for the reason that it was signed prior to the birth of the child." *Id.* at 414.). However, we are not writing on a clean slate. At least since *Johnson*, pre-birth consent has been the law in this jurisdiction. And although I am not so sure the doctrine of legislative acquiescence requires adherence to the rule of either *Johnson* or *H.M.G.*,[1] I do agree that "decades worth of Indiana adoptions have occurred where the parties' expectations may well have been set based on *H.M.G.'s* holding," op. at 1062, as well as the holding in *Johnson*. Because the general public, service providers, as well as the legal community have ordered their affairs in accordance with this long-standing precedent, I would be reluctant to alter the landscape. Thus, I would continue to adhere to the rule of *H.M.G.* that a pre-birth consent to an adoption is valid provided there is post-birth conduct ratifying the consent.

The problem in this case however is whether there was ever pre-birth consent in the first place. Unknown at common

---

1. The doctrine provides that "the failure of the legislature to change a statute after a line of decisions of a court of last resort giving the statute a certain construction amounts to an acquiescence by the Legislature in the construction of the court and that such construction should not then be disregarded or lightly treated." *Heffner v. White*, 221 Ind. 315, 47 N.E.2d 964, 965 (1943); *see also Miller v.* *Mayberry*, 506 N.E.2d 7, 11 (Ind.1987); *Foster v. Evergreen Healthcare, Inc.*, 716 N.E.2d 19, 28 (Ind.Ct.App.1999), *trans. denied*. There has not been a "line of decisions" from any court construing the validity of pre-birth consent. Further, until today this is the first occasion a "court of last resort" has weighed in on the issue.

law, adoption is purely a creature of statutory creation. Importantly, the law in this jurisdiction is clear, unequivocal, and of long duration that the Adoption Code must be strictly construed in favor of the rights of the natural parents. *Adoptive Parents of M.L.V. v. Wilkens,* 598 N.E.2d 1054, 1056 (Ind.1992); *Emmons v. Dinelli,* 235 Ind. 249, 133 N.E.2d 56, 60 (1956); *Bray v. Miles,* 23 Ind.App. 432, 54 N.E. 446, 448 (1899). This is so because the parent-child relationship represents a bundle of human rights of fundamental importance. *In re Adoption of Thomas,* 431 N.E.2d 506, 512 (Ind.Ct.App.1982). Additionally, strict construction is traditionally required because adoption proceedings deprive natural parents of all their rights over their children forever. *In re Adoption of Force,* 126 Ind.App. 156, 131 N.E.2d 157, 158 (1956). In this case the statute provides in no uncertain terms that consent occurs when it is executed in the presence of one of the five listed entities. *See* Ind.Code § 31–19–9–2. That did not happen here. Thus, there was no consent. And absent consent there is nothing to which post-birth conduct can attach. I therefore dissent and would affirm the judgment of the trial court.