EMONS *v.* DINELLI ET AL.

[No. 29,408. Filed March 27, 1956.]

*Samuel Schulman, Paul V. Paden,* of South Bend, and *F. Le Roy Wiltrout,* of Elkhart, for appellant.

*Albert L. Doyle,* of Mishawaka, and *Dan C. Flanagan,* of Ft. Wayne, for appellees.

ACHOR, J.—Albert Dinelli, now deceased, and his wife Hazel L. Dinnelli filed a petition in the St. Joseph Probate Court on January 19, 1951, for the adoption of Mary Alice Galloway, a minor child of the appellant by her deceased husband. Said petition alleged that the appellant had abandoned and deserted Mary Alice for more than six months prior to the filing of the petition and therefore her consent to the adoption should be

dispensed with. The appellant appeared and resisted the granting of said petition primarily on the ground that she had not abandoned or deserted her child within the meaning of the Indiana statutes governing adoption. The court, however, found that she had "abandoned and/or deserted" the child, and decreed the adoption of the child without the consent of appellant.

The decision is challenged on the ground that it is not sustained by sufficient evidence and is contrary to law. Albert Dinelli having died in the meantime, this controversy has become one between his widow Hazel Dinelli and the appellant, and our use of the word "appellee" hereafter refers to Hazel Dinelli only.

The evidence taken at the trial is voluminous and characterized by many marked conflicts in the testimony. The contrast in the testimony of the parties is likened to that of a single canvas painted on both sides. However, inasmuch as the trial court, who saw the witnesses, observed their demeanor and heard the testimony from their lips, decided these conflicts in favor of appellee, it is not within the province of this court to weigh the evidence but to consider only that evidence most favorable to appellee and the reasonable inferences drawn therefrom, and to determine therefrom whether that evidence is sufficient to sustain the decision of the court within the standard of proof required by the law. *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. 2d 669; *New York Central Ry. Co.* v. *Milhiser* (1952), 231 Ind. 180, 106 N. E. 2d 453, 108 N. E. 2d 57; *State ex rel.* v. *Graham* (1953), 231 Ind. 680, 110 N. E. 2d 855; *Johnnie Jones Exposition Co.* v. *Terry* (1945), 116 Ind. App. 189, 63 N. E. 2d 159.

The evidence presents us with the circumstances where a young mother, whose husband died on December 10, 1946, was left with two small children, Carol

Anne, aged four years, and Mary Alice, aged four months, to care for and support. At the time of her husband's death, Carol Anne was staying with a paternal uncle and aunt, Mr. and Mrs. Hubert L. Keith, where she has remained ever since without support from the appellant. After her husband's death, appellant moved in with the Keiths and stayed there during the remainder of the month of December, 1946. During this time she would leave in the morning and return in the evening. She did not take care of her children nor contribute to their support. In January, 1947, appellant took her infant daughter, Mary Alice, and moved in with her mother and father, where they stayed until the month of March.

Appellant then placed the child in the home of appellee, also a paternal aunt, under the following circumstances:

Appellant sent word to appellee that her father had "kicked her out," and that she had "no place to go" and that unless appellee would take Mary Alice she "would have to put her in an orphans' home." Appellant now says that she and Mary Alice "could have stayed with them (her parents), but didn't." Confronted with this representation, appellee reluctantly agreed to take the baby, then seven months of age, with the understanding that appellant would help take care of her, and that appellant would take her back and make a home for her on June 1, 1947, when she finished a beauty course.

Having thus placed her children, appellant moved out of the home of her parents and into the home of her mother-in-law, Mary Galloway, where she lived until July, 1949. There was no understanding regarding payment of support for the child except that the social security payments received by reason of her father's death, which were not sufficient for the child's actual

expenses of support, were made payable to appellee. Appellant did not finish her beauty course on June 1, and then asked appellee to keep the child until September 1, when the course would be completed. This appellee agreed to do. However, after completing her beauty course on September 1, appellant did not take her child as agreed and appellee continued to keep and care for her, except on week-ends and holidays, when appellant took the child at the insistence of appellee. On these occasions appellant would take the child to the home of Mrs. Galloway, were she enjoyed the free use of the home. On every such occasion appellant dressed up and went out, leaving Mrs. Galloway to take care of the child. She would return after Mrs. Galloway and the baby were in bed. When she had the children appellant would "nag them," "abuse them," "slap them," "call them names," and say she was going "to put them in the orphans home." Mary Alice would be returned dirty, her clothes soiled and "a mess."

On Thanksgiving and Christmas, 1947, appellee asked appellant to take Mary Alice and get Carol Anne so that she could have the children together. On both of these occasions the child was returned sick at her stomach, followed by violent vomiting during the night. On the latter occasion, appellant told appellee that the child "had been a hell all day," and she was glad to bring her back. Following these unfortunate incidents, Mrs. Galloway contacted appellee and urged her not to let appellant have the baby again on account of the way she abused the child when she had it with her. Following these experiences, appellee told appellant "never take Mary Alice again and bring her back sick," that "when you take her again it will have to be for good." After Christmas, 1947, appellant never took the child from appellee's home for any period of time, and never

again asked for the child except on two occasions in 1950. On each of these occasions appellant was reminded of her former treatment of the child and was told, "If you take Mary Alice, you will have to keep her." Appellant left without the child on each of these occasions.

During 1947 the relationship between appellee and appellant was friendly. Thereafter it was indifferent. Appellant visited the child almost every week in 1947 and 1948. However, in 1949, the visits began "tapering off." Appellant "would come once a week, miss two or three weeks . . . come every week, then skip a month." The visits were usually short. They often occurred while the child was asleep. On other occasions she would "pick up the child" but "there was little show of affection." There were no visits by or communications from appellant between Christmas 1949 and Valentine's Day, 1950. Thereafter for a few months appellant and Mr. Emmons would stop by every two or three weeks, and on these visits appellant would occasionally lay down a five dollar bill and say, "This is for Mary." On May 30, 1950, appellant gave appellee a ten dollar bill and stated: "This is Mary's room rent," to which appellee replied, "You are not paying room rent for Mary, you never have." The money was returned to appellant and appellant thereafter neither offered nor contributed anything toward the child's support, although she did bring her gifts on three occasions prior to the filing of these proceedings on January 19, 1951.

Facts in evidence regarding appellant's financial position are as follows: After payment of the debts and funeral expenses of her husband, her material assets consisted of her household furnishings and slightly more than $2,000.00 cash. Appellant had no earnings until September, 1947. From September, 1947 to Jan-

uary, 1948 she made $15.00 a week as a beauty operator. From January to June, 1948, she worked at Ball Band Rubber Company, where she made approximately $45.00 a week. From June, 1948, until after the filing of these proceedings on January 19, 1951, appellant worked at Bendix, where she made $85.00 a week except for short layoffs. Appellant lived with Mrs. Galloway from March, 1947, to July, 1950, but paid no rent. She paid no support to the Keiths for Carol Anne and gave appellee occasional "gifts" for Mary Alice totalling "about $200.00."

Further evidence bearing on appellant's attitude toward her child is the fact that although the child had the usual children's diseases such as chickenpox, measles, mumps, etc., appellant did not take care of her during any of these periods and, on one occasion in 1948, when appellee asked for relief, appellant refused, stating she might catch the disease herself.

Appellant and Jack Emmons were married on October 29, 1950. In the early part of December, 1950, appellee and the Keiths arranged for a conference with appellant, then Mrs. Emmons, for the purpose of determining her intentions regarding her children. Mr. and Mrs. Emmons were living in the basement of a house they were building, doing all the work themselves on evenings and week ends. Appellant was reminded that she had been married for several weeks and that "nothing had been said about plans for the children." To this inquiry, appellant replied: "Well, you have been taking care of her all the time. Why all of a sudden do you want us to take her? We want to have a home, furniture and everything before we take the children, maybe we can take them when school starts." Appellant was then told, "If you do not want the children," appellee would adopt Mary Alice and the Keiths would adopt

Carol Anne. Appellant said she could not take the children and would not consent to their adoption. Appellee then told appellant she should "either take the child or let me know what you want to do" in a week or ten days. Nothing further was said or done in the matter. Appellee continued to care for the child and on January 19, 1951, she filed this suit for her adoption.

Appellant concedes that under the evidence it might be concluded that she may have been negligent in the care and support of her child, which evidence might be persuasive in a proceeding in habeas corpus affecting the welfare of the child. However, attorneys for appellant urge with able briefs and fervent argument that this evidence and all legitimate inferences flowing therefrom are not sufficient to sustain the court's finding that appellant had "abandoned and/or deserted" her child within the standard of the adoption statute.

Appellant rests her case upon the fact that adoption, as contrasted with habeas corpus proceedings, is a special statutory proceeding unknown to the common law, under which parents had an absolute and inalienable proprietary right to their children and that, being in derogation of the common law, the adoption statutes must be strictly construed in favor of such rights of the natural parents. In support of this position appellant cites 1 Am. Jur., Adoption of Children, §9, p. 626, as follows:

"The courts are quite uniform in applying the rule of strict construction in favor of a parent's natural rights in adoption proceedings, especially in those cases where it is claimed that owing to misconduct his consent to the adoption is not required. Every intendment should be made in such case in favor of the parent's claim; and where the statute is open to construction and interpretation, it should be construed in support of the parent's natural rights. . . ."

The word "abandonment," as used in the adoption statute in 1 Am. Jur., §42, p. 643, is defined as follows:

"Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. . . . In many states the term 'abandon,' as used in statutes relating to adoption, has been construed to mean no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children. . . ." 2 C. J. S. 388; *Winans* v. *Luppie* (1890), 47 N. J. Eq. 302, 20 A. 969; *Weinbach's Appeal* (1934), 316 Pa. 333, 175 A. 500; *Shumway* v. *Farley* (1949), 68 Ariz. 159, 203 Pac. 2d 507; *Knochemus* v. *King* (1927), 193 Iowa 1282, 188 N. W. 957; *In re Davie's Adoption* (1946), 353 Pa. 579, 46 A. 2d 252; *Parsons* v. *Parsons* (1898), 101 Wis. 76, 77 N. W. 147.

Also, in the matter of parental rights, Vol. 1 Am. Jur., §41, p. 642, it is said:

"The right of a parent with respect to his child is not an absolute paramount proprietary right or interest in or to the custody of the infant, but is in the nature of a trust imposed in him, which imposes upon him the reciprocal obligation to maintain, care for, and protect the infant, and the law secures him in this right so long as he shall discharge the correlative duties and obligations, and no longer. . . ."

Admittedly, there can be no adoption in the absence of consent, unless the ultimate fact of abandonment or desertion is found to exist. The issue with which we are concerned involves the criterion or evidentiary facts necessary to support the ultimate fact of such abandonment or desertion. In determining the elements or criterion of the words "abandoned or deserted," as used in our adoption statute, we look first to the language and purpose of the statute. That portion of the adop-

tion statute (§3-120, Burns' 1946 Repl.) (Acts 1943, ch. 40, §5, p. 89) involved in this appeal reads:

> "If such child have parent or parents living, he, she or they shall have consent in writing to such adoption. . . . Such consent of parent or parents may be dispensed with if such child is adjudged to have been abandoned or deserted for six (6) months or more immediately preceding the date of the filing of the petition. . . ."

Significantly our adoption statute omits the use of the word "wilful," as characterizing the abandonment or desertion. In contrast, the Ohio statute uses the term "wilfully abandon" and, in construing that statute, the probate court of that state stated with reason that " . . . The word 'wilfully' as used in the statute has a definite meaning which requires that neglect of the parents must be intentional. Without the word being used the neglect of duty could be caused by carelessness and neglect and, therefore, be unintentional. . . ." *In re Adoption of Gates* (1948), 84 Ohio App. 269, 270, 85 N. E. 2d 597, 598. Therefore, looking to the language of our statute, we conclude that the careless and negligent failure to perform the duties of parenthood is a significant element of the offense of abandonment or desertion, which neglect is to be considered regardless of any actual "intention" or "settled purpose" by the parent to relinquish the proprietary claim of the parent to his child.

We next turn our consideration to the decisions of our courts to determine what precedent lies before us by which our decision is governed. In the early case of *Bray* v. *Miles* (1899), 23 Ind. App. 432, 436-437, 54 N. E. 446, 448, 55 N. E. 510, the policy of our courts was stated as follows: " . . . (although) it has frequently been said that it (the adoption statute) is to be

strictly construed. . . . The statute is not to be so strictly construed as to defeat its purposes. . . ."

Later, in the case of *Leonard* v. *Honisfager* (1909), 43 Ind. App. 607, 609, 88 N. E. 91, the purpose of the statute and the rule of construction regarding it were enunciated as follows:

"The object or purpose of our statute relating to this matter is manifestly to give to unfortunate children, who have been bereft of home and parental care, the benefits of a home and of such parental care, and the law should receive a liberal construction to effect this purpose."

However, appellant contends that this court in the most recently reported case on the subject has brought this state in line with the majority rule, as heretofore stated in 1 Am. Jur., §9, p. 626. The case relied upon is that of *Glansman* v. *Ledbetter* (1921), 190 Ind. 505, 516-517, 130 N. E. 230, 234. In that case this court stated the rule which we now reaffirm:

". . . It (the adoption statute) is in derogation of the common law, which made no provision for the adoption of children . . . and it must be strictly followed in all essential particulars. . . ."

An examination of that case discloses that the "single question" presented was the sufficiency of the notice to the mother in the proceedings by which the child was adopted. Then, as now, the statute required that, in the absence of a formal consent of adoption, personal service of notice upon the natural parent as adversary party was necessary, except upon affidavit that the residence of the child's parents "after diligent inquiry is unknown." §3-120, Burns' 1946 Repl. Notice by publication was had, based on a false and fraudulent affidavit that after diligent inquiry the residence of the

parents was unknown. Upon this issue thus presented the court stated (190 Ind. 505, at pages 519-520, 130 N. E. 230, at page 235):

> ". . . under the facts in this case it was made to appear without contradiction that the facts essential to give the court jurisdiction over the person and subject-matter were grounded upon a fraudulent suppression of the truth, and misstatement of facts calculated and apparently intended to deceive the court into assuming jurisdiction of the particular proceedings, and the rendition of a judgment to which the respondents were not entitled to except for the fraud, deception, and imposition practiced on the Court. *Booth* v. *Van Allen* (1870), 7 Phila. (Pa.) 401."

The full context of the statement from the above case relied upon by appellant, is as follows at *(190 Ind.)* pages 516-517:

> "To the *petition* for the child's adoption the mother was entitled to notice as an essential element to give the court jurisdiction to act upon the petition and render a valid judgment. . . .
>
> "No other than constructive notice to the mother is claimed, which is said to be sufficient under §3098, *supra*. This statute is the one invoked by the adoption petitioners. It is in derogation of the common law, which made no provision for the adoption of children . . . and it must be strictly followed in all essential particulars. . . ." (Our italics.)

We do not construe the above case as changing the rule formerly announced in the *Bray* v. *Miles, supra,* and *Leonard* v. *Honisfager, supra,* cases. The statement quoted from the *Glansman* v. *Ledbetter* case, *supra,* is related to the *procedural requirements* of the adoption statutes (§3-120, Burns' 1946 Repl. *supra,* which are jurisdictional and must

be strictly followed in all essential particulars. The case does not attempt to construe the statute as restricting the elements or criterion which the courts may consider in determining the ultimate fact of "abandonment or desertion" as the term is used in the statute.

The same issue was before the court in the cases of *Markover* v. *Krauss* (1892), 132 Ind. 294, 298-299, 31 N. E. 1047, 1049, and *Bray* v. *Miles* (1899), 23 Ind. App. 432, 436-437, 54 N. E. 446, 448, 55 N. E. 510, *supra.* In those cases our courts specifically held that, because of the fact that adoption statutes were in derogation of the common law, the procedural requirements were jurisdictional and must be strictly followed in each particular. However, the cases also emphasized the fact that our adoption statutes were, themselves, adopted from the Roman law and that therefore the *substantive law* of adoption exists in our jurisprudence by engrafting from the Roman law and therefore that our statutes on the subject are to be construed in part by judicial application of the Roman law thereto. Upon this subject the Supreme Court in the case of *Markover* v. *Krauss, supra,* stated at pages 298-299 as follows:

> "The law of adoption comes to us from the Roman law, and its appearance in our system of jurisprudence is in the nature of an engrafting of certain principles of that law rather than a statutory creation."

Subsequently our Appellate Court in the case of *Bray* v. *Miles, supra,* elaborated upon the subject as follows:

> ". . . Adoption was unknown to the common law. It was regulated by law in Greece and Rome. In Rome the system was in vogue before the time of

Justinian.[1] He reduced the system, which prior to his time was encumbered with formal ceremonies, to a code which simplified the proceeding, and from which modern legislation upon the subject has derived its chief features, adapting them to our wants. It was introduced as a part of the civil law in this country from France and Spain respectively to Louisiana and Texas. For the reason that it (the adoption statute) is purely statutory and in derogation of the common law, it has frequently been said that it is to be strictly construed. This expression occurs in the reported cases in which the *jurisdiction* of the officer or *tribunal* or the regularity of the proceedings of adoption have been called in question. . . ." (Our italics.)

However, as heretofore stated, the court in the above case concluded its discussion of the question by stating, "The statute is not to be so strictly construed as to defeat its purpose."

After analyzing our reported cases, we construe them as holding that inasmuch as the adoption statute is in derogation of the common law, its *procedural requirements* are *jurisdictional* and must be strictly followed. But we do not consider the case of *Glansman* v. *Ledbetter, supra,* as limiting or circumscribing the criterion or elements which the court may consider in determining the ultimate fact of abandonment or desertion, as stated in the earlier cases of *Bray* v. *Miles, supra,* and *Leonard* v. *Honisfager, supra.*

We conclude that the reported cases are not decisive of the issue before us, and are helpful only in so far as they hold that in determining the ultimate fact as to whether a child has been "abandoned or deserted," the law should receive a liberal construction to the end

1. The Apostle Paul makes frequent reference and places special significance upon the practice of adoption, in his several epistles.

that unfortunate children who have been bereft of home and parental care may be afforded the benefits of an adoptive home and parental care.

However, appellant insists that under any construction of the statute, in order to constitute abandonment there must exist not only (1) a failure to discharge "the correlative duties and obligations" of parenthood, but there must also be (2) an actual "intention" or "settled purpose" to relinquish all parental claims to the child. Appellant insists there is no evidence of such "intent" or "settled purpose" to relinquish all parental *claims* to the child, and therefore there was no "abandonment or desertion" within the terms of the statute. In determining this question, it is helpful to consider the function of the abandonment as prescribed by the statute (§3-120, *supra*).

As a prerequisite to every adoption, a relinquishment by the natural parents must be found to exist. *Nugent* v. *Powell* (1893), 4 Wyo. 173, 33 Pac. 23. Under the statute the required relinquishment for adoption by consent is dispensed with when abandonment or desertion is adjudged to exist. Obviously a consent executed by natural parents must be the voluntary or intentional act of such parents. Having so executed the instrument they are bound by the consequences which the law attaches to it.

It is suggested that by analogy, relinquishment based on desertion or abandonment must, likewise, be accompanied by an actual intent to effect such relinquishment. However, this is not altogether true because the analogy is not complete; whereas relinquishment by consent is the voluntary act of the parent, relinquishment by abandonment is by operation of law. In the latter case, it is only necessary that the "intention" or "settled purpose" of the parent exist as to his non-performance of

his required parental "duties and obligations." Having voluntarily failed in this parental obligation the consequences of his acts are prescribed by the law.

What facts then are necessary to establish the ultimate fact of abandonment wherein the law imputes an "intent" or "settled purpose" to relinquish parental claim to a child? The law upon this subject has been well stated by courts of other states:

> "The right of the parents is not an absolute right of property, but is in the nature of a trust reposed in them, and is subject to their correlative duty to care for and protect the child; and the law secures their right only so long as they shall discharge their obligation. *Nugent* v. *Powell,* 4 Wyo. 173, 33 Pac. 23, 20 L. R. A. 199, 62 Am. St. Rep. 17; *Gishwiler* v. *Dodez,* 4 Ohio St. 615; *Ex Parte Crouse,* 4 Whart. (Pa.) 1, 11." *Purinton* v. *Jamrock* (1907), 195 Mass. 187, 201, 80 N. E. 802; The Yale Law Journal, p. 1246, 1 Am. Jur., §41, pp. 642-643.

Also in *Hazuka's Case* (1942), 345 Pa. 432, 435, 29 A. 2d 88, the court said.

> ". . . It (abandonment) may be effected by a formal legal instrument or merely by conduct evincing a settled purpose to forego all parental duties and relinquish all parental claims. It is a matter largely of intention to be ascertained from the circumstances, and whether or not a child has been abandoned is a question of fact. In the present case it was proved to the satisfaction of the court that abandonment had occurred, and if there is evidence to support that finding it must be sustained by this court: . . . It is true that she made protestations from time to time of her desire to keep the child, but her actions, speaking louder than words, show—at least so the orphans' court found—that she had no real intention of assuming any parental responsibility in regard to it. . . ."

In a more recent case, the Pennsylvania Supreme Court, confronted with a situation very analogous to our own, stated:

"When, then, does abandonment become complete? That is a question of fact to be determined from the evidence. It requires an intent to escape parental responsibility, and conduct in effectuation of such intent: See *Hazuka's Case, supra.* However, the inexorable circumstances of a child that has been abandoned may soon render the abandonment effectual. That is necessarily so. A child's natural needs for food, clothing and shelter demand that someone immediately assume the attendant responsibility which an abandoning parent has ignored; and, that responsibility endures constantly. It does not await the capricious decision of an uncertain parent, perhaps, years later. The longer the responsibility continues to be discharged capably by the foster parent, the stronger become the ties that form out of the new relationship until there comes a time . . . when the welfare of the child may justly require that the parental responsibility be allowed to remain where the abandoning parent has willingly permitted it to be." *Davies Adoption Case* (1946), 353 Pa. 579, 587-588, 46 A. 2d 252, 257.

In the case before us, we are confronted with evidence which supports the fact that appellant evinced a "settled purpose to forego her parental *duties*" to the child. However, on the other hand, the evidence is uncontradicted that she evinced no such "settled purpose" as to her *claims* to the child.

We are confronted on the one hand by the fact that, for a period of nearly four years prior to the filing of these proceedings, the child was "bereft of a home and parental care." During this period appellant imposed the burden of providing a home and care for her infant daughter upon the child's paternal aunt, although she

could have kept the child with her in the home of her parents "but didn't." During all this time she was loathe to assume her parental *duty* to care for the child, even temporarily. She did, however, maintain an interest in the child during this period by visiting her at irregular intervals and giving her occasional presents and monetary "gifts" totalling "about $200.00."

The issue of "intent" or "settled purpose" with which the trial court was confronted as bearing on the fact of relinquishment is significantly pointed up by the statements of the parties themselves. Appellant's statement is: "I never *intended* to leave Mary Alice with the Dinellis permanently and entirely." Appellee's statement is: "After the child was there the first year, I figured Mrs. Emmons never *cared* enough for her to take her."

What, then, must be the position of our courts on the subject of the "abandonment or desertion" of a child by a parent who manifestly intends to keep and enjoy the privileges of parenthood, but refuses to assume its corresponding duties and responsibilities over an extended and indeterminate period?

Appellant urges that we should apply the standard of "abandonment" adopted in divorce cases, wherein we have held that the mere denial of companionship and support does not constitute abandonment. However, facts bearing upon abandonment in divorce and adoption cases are not analogous. Failure by one adult to provide a home, companionship, and support to another is quite a different thing from the denial of home, care and support incumbent upon a parent for his child. This is particularly true if the child is an infant, completely helpless and dependent as to its every need.[2]

---

2. Wilful abandonment of a child is made a criminal offense, §10-809, Burns' 1942 Repl. (Acts 1889, ch. 201, §2, p. 363). Also,

A parent's "legal title" or "proprietary claim" to a child's filial affection and obligation, although important, cannot be dictated by inflexible doctrine in favor of a parent who denies any "actual intention" to forego that title or claim to his child, but who at the same time neglects his parental duty to personally care for, support, educate, give moral and spiritual guidance, and provide a home and that love and security which a home provides. Of what importance is it to a child if his parents do not "intend" to rob him of the nurture, love and security of a happy home, if such a home is not provided?"

The trial court in this case found that appellant had "abandoned and/or deserted" her child more than six months prior to the filing of the petition on January 19, 1951. There is substantial evidence which supports this finding. If and when such abandonment and/or desertion became complete, and the period of its duration, were questions of fact to be determined from the evidence by the trial court.

Having determined these facts, it then became the duty of the trial court to make such disposition of the case as "the best interests of the child" dictated. Evidence as to the conduct, position and attitudes of both parties, both before and after the filing of the petition, was material in determining this issue. Other facts the court was equally bound to consider are the normal ties of love and loyalty borne of blood relationship and the conduct of the natural parent evincing a willingness to reassume the parental responsibilities previously neglected. Accordingly, three course of action were available to the trial court: It was within its sound discretion (1) to grant the adoption; (2) to

failure of a father to support his child for one year may dispense with necessity of consent, §3-120, Burns' 1946 Repl. *supra*.

deny it and leave the parties as he found them, or (3) under proper pleading to deny the adoption and return the child to her natural parent.

In the case before us, the trial court, after weighing the evidence, concluded that there was a sufficient wilful withholding of parental companionship, support, care and protection, sympathy and affection for her child by the mother to constitute "abandonment and/or desertion;" that such condition had existed for six (6) months, and that the best interests of the child would be served by the adoption, as proposed. Because of the marked conflicts which characterized the evidence in this case, we are aware that the trial court was confronted with a problem which would have challenged the wisdom of Solomon. However, we have carefully stated the evidence which we are permitted to consider, and the principles of law by which the decision must be governed. We cannot say, without weighing the evidence and thus usurping a duty and prerogative of the trial court that the finding is not sustained by the evidence.

Judgment is therefore affirmed.

Bobbitt, C. J., Arterburn and Landis, JJ., concur.

Emmert, J., concurs in the result.

Note: Reported in 133 N. E. 2d 56.