**DIVISION OF SOCIAL SERVICES,**
Petitioner,

v.

**Carmen N. TUSIKI,* Respondent.**

Family Court of Delaware,
New Castle County.

Submitted April 23, 1982.

Decided May 19, 1982.

Carol S. Widing, Wilmington, for petitioner.

Charles F. Daley, Jr., Wilmington, for respondent.

GALLAGHER, Judge:

I.

Before the Court for adjudication is the petition of Division of Social Services (DSS) for termination of the parental rights over three children, Mary, born January 20, 1967, Kathie, born July 28, 1970 and Robert, born September 24, 1973. In August 1980, custody of all three siblings was granted to DSS. The Court has already terminated the parental rights of the natural mother (mother)[1] In addition, the Court has terminated the parental rights over Mary claimed by one man, with his consent, and also the parental rights over Kathie by two men claiming parentage, with their consent.[2] The Court has also terminated the parental

---

\* A pseudonym adopted to preserve the privacy of the parties.

1. Mother has had nothing to do with her children since she left them with DSS in January, 1980. There is every reason to believe she lives and works in the Wilmington area, knows of these proceedings, but deliberately has kept her distance.

2. Actually, the parental rights of one of these men will be terminated by the Court following this disposition.

rights over Robert claimed by two men, with their consent. Only the parental claim of Carmen N. Tusiki (father) must be decided by the Court. DSS claims that father has either abandoned or failed to plan for Kathie as required by the statute.

A hearing was held on April 13, 1982, on the petition of DSS to terminate the parental rights of father over Kathie. After weighing the evidence in light of the applicable legal principles the Court has decided that father's parental rights, *if any*, over Kathie shall be terminated.

## II.

Termination of parental rights is sought here on two alternative grounds, (1) abandonment and (2) failure to plan adequately for Kathie's physical needs or her mental and emotional health and development. 13 *Del.C.*, Sec. 1103(3), (5).

Counsel in their memoranda of authorities presented to the Court focus entirely upon "abandonment" and speak not at all of "failure to plan". The Court assumes, therefore, that petitioner does not any longer seriously urge this ground for termination. This is understandable in view of the factual situation. One can hardly make plans for a child if he cannot control plan effectuation. Therefore, the Court will focus attention on "abandonment".

"Abandonment" is defined in 13 *Del.C.*, Sec. 1101(1) as follows:

"(1) 'Abandoned' shall be interpreted as referring to any child who, for a period of 6 months, or to any newborn infant who, for a period of 90 days, has not received any regular and reasonable financial help from his parent or parents or any person having parental rights or responsibility and on whose behalf no substantial contacts have been initiated by his parent or parents or any person having parental rights or responsibility during that period."

Here, the evidence is clear and convincing that during the first six months of the year 1972 (indeed from then until the present time), father has furnished no "financial help" at all to Kathie and has had "no substantial contacts" with her. Clearly, the statutory tests for establishing "abandonment" are met.

Even where the statutory "abandonment" tests are satisfied the Court must find before ordering termination that ". . . termination of existing parental rights and their transfer (is) in the best interest of the child. . ." 13 *Del.C.*, Sec. 1108(a). By and large this opinion will be concerned with "best interest".

Before reaching "best interest" one must ask whether there is any additional test that must be satisfied other than those recited above? Must petitioner prove intent to forego parental duties and relinquishment of all parental rights? Certain Delaware cases appear to so hold. *Cline v. Hartzler*, Del.Supr., 227 A.2d 210 (1967); *In re Erthal*, Del.Supr., 239 A.2d 626 (1968); and *G. v. S.*, Del.Supr., 238 A.2d 834 (1968).

In *Cline v. Hartzler, supra*, the trial judge found that by a literal application of the statute the father had abandoned his son but refused to order termination of parental rights because father's conduct did not evidence a "settled purpose" to abandon those rights. In affirming the trial court the Supreme Court said (227 A.2d at 212):

"It is clear that the abandonment of a child by a parent is evidenced preliminarily by any conduct on the part of the parent evidencing a settled purpose to forego all parental duties and relinquish all parental claims to the child. The parent must, in effect, renounce and forsake the child entirely. 2 Am.Jur.2d, Adoption, Sec. 32.

This is the general law and, under the law of this State, it is necessary to prove this intent on the part of the parent charged with abandoning his child, as well as to prove any statutory requirement evidencing abandonment. *In re Kline*, 24 Del.Ch. 427, 8 A.2d 505."

The language from *Cline* indicates that subjective intent is a necessary element of abandonment. However, two more recent cases cast doubt on that conclusion.

In *In re One Minor Child*, Del.Supr., 277 A.2d 680 (1970), the Court quoted a ruling of the trial court as follows:

"'THE COURT: I am going to deny the Petition because I am satisfied from the testimony of Mrs. Carroll that there has been no intent to abandon here. There is not merely a formal matter where you are charging objective statutory facts. You are charging a state of mind, not just visiting on the part of the parents, in this case. So I don't think it has been shown, so the Petition is denied.'"

In reversing the trial court the Supreme Court said:

"It is our opinion that ... the conclusion of the Orphans' Court was clearly erroneous. See *Nelson v. Murray*, Del.Supr., 211 A.2d 842 (1965); *Lank v. Steiner*, Del.Supr., 224 A.2d 242 (1966). The child was abandoned within the meaning of Sec. 1101; and clearly, we think, it is in the best interest of the child to clear the way for adoption of the child by the foster mother by the grant of her petition to terminate parental rights. Compare *In re E*, Del.Supr., 239 A.2d 626 (1968)."

Finally, the Supreme Court spoke again in *Matter of Three Minor Children*, 406 A.2d 14, 19 (1979) as follows:

"In *Cline v. Hartzler*, Del.Supr., 227 A.2d 210, 212 (1967), we spoke of the dual requirements for termination of parental rights, namely, (1) facts justifying termination and (2) a finding under the statute of such termination being 'in the best interests of the child'."

Since it is unclear whether "intent to abandon" remains an essential element of "abandonment", petitioner asks the Court not to focus exclusively on the parent's subjective intent (since the later cases do not) but to ask whether the "offending" parent has exhibited conscious disregard for his parental obligations. See, *In re Burns*, Pa.Supr., 379 A.2d 535, 541 (1977); *D. M. v. State*, Supr. Alaska, 515 P.2d 1234 (1973); *In re Adoption of K.*, Mo.App., 417 S.W.2d 702 (1967), and *Emmons v. Dinelli*, 235 Ind.

249, 133 N.E.2d 56 (1956). I agree and believe that our Supreme Court has held that in determining intent the Court must view evidence, not only of subjective intent, but of conduct as well. See, *Cline v. Hartzler, supra; In re One Minor Child, supra*; and *Matter of Three Minor Children, supra.*

■ I hold that three tests must be met before parental rights can be terminated on grounds of "abandonment". First, there must be proof of the explicit statutory elements. Second, there must be proof of intent to forego all parental duties along with relinquishment of all parental claims; and this proof can be established by expressions of subjective intent and/or objective evidence demonstrating conscious disregard of parental obligations. Third, there must be proof that termination is in the child's best interest.[3]

■ The proof that is required to terminate parental rights must be furnished by clear and convincing evidence. *Santosky v. Kramer*, —— U.S. ——, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The preponderance of the evidence test enunciated in *Matter of Five Minor Children*, Del.Supr., 407 A.2d 198 (1979) would appear no longer to be controlling.

■ Since, as we have seen, the specific statutory elements of abandonment have been established by clear and convincing evidence we must now examine intent to abandon and best interest of the child.

### III.

Has it been established that father intended to forego all parental duties and relinquish all parental claims over Kathie? Turning from evidence of father's subjective intent where he says that he has never abandoned Kathie, thinks about her occasionally, has always wanted her and really is her father, the objective evidence is clear and convincing that father completely disregarded his parental interests and obligations and took no action to assert a parental

---

**3.** "Best interest" never comes in issue until there has been a finding of abandonment. *DSS*

*v. Cochran*, Del.Fam., No. T–81–01–1 (June 29, 1981).

claim to Kathie until after these proceedings were begun.

At the end of 1970 father moved from the residence that he had occupied with mother, Kathie and two other children.[4] Any support contributed for Kathie ceased around Christmas, 1971. Although mother's father lived outside of Wilmington and her brother lived near St. George's, Delaware, father made only two attempts to contact mother's father and none at all to contact her brother. The only information he ever acquired was that mother's father did not know where mother and Kathie were living. Father made no effort to search for Kathie. He made no effort to determine whether Kathie was enrolled at a school in Delaware. Mother, Kathie and the other children lived in her father's house near Wilmington from 1975 to 1980 but father never stopped at the house which is only six miles from his own residence to see if Kathie were living there or whether anyone else living there could provide him with information. When father was advised by DSS that Kathie was living in Delaware with foster parents he at first denied paternity (although he now claims paternity) and accepted without challenge a DSS decision that he remain away from Kathie. He has never filed a petition with the Court for custody or visitation with Kathie. He has not provided any support for Kathie since the end of 1971.

Father's present wife has a bizarre interest in Kathie. The Court suspects that her interest may be far greater and more significant than father's interest which may well have been sparked by her interest. Father and his present wife have been married since 1974 and have no children. The present wife herself has two adult children of a previous marriage. This woman testified that she had a very bad experience in her own life when she found out that the people she thought were her parents were actually not her parents. She went to Kathie's school on two occasions to see Kathie representing herself on one occasion to be Kathie's mother and on the other occasion to be a social worker. She was arrested for impersonation on the second occasion. Strangely, father and his present wife have made all kinds of plans for Kathie but they don't know Kathie and Kathie does not know them.

The following quotations from *In re Adoption of Thornton*, 171 Ind.App. 457, 358 N.E.2d 157, 158, 159 (1976) are most instructive:

"Appellant first contends that her failure to communicate with her daughter was justified because it was not shown that appellant was able to communicate. She asserts that the child was taken away from her involuntarily in Minnesota, and that due to certain irregularities in the subsequent proceedings, she did not know of her daughter's whereabouts until March, 1974. However, Vivian Kline, appellant's mother, testified that the attorney which appellant had retained to set aside the Minnesota proceedings informed her on or about January 10, 1974, that Beverly was being released to the custody of appellees. Moreover both appellant's mother and father knew the whereabouts of appellant at all times. Thus, while appellant may not have known where her daughter was until March, 1974, there is nothing to indicate that she had inquired about the child or that if she had, she would not have been informed of the child's whereabouts. See *In re Adoption of Jagodzinski* (1971) 444 Pa. 511, 281 A.2d 868. Finally it should be noted that appellant had no substantial communication with her daughter upon learning of the child's whereabouts."

\* \* \* \* \* \*

"Such statute [IC 1971, 31–3–1–6 (Burns Code Ed.)] contemplates communication with the child itself and not merely involvement in litigation relating to the child's custody. The participation in such litigation would be relevant where, for example, the persons having custody of such child actively prevented the parent from communicating with the child.

---

4. Father and mother never married.

However, as hereinabove stated, appellant made no attempt to communicate with her daughter. Thus the mere participation in litigation involving the custody of the child is not sufficient justification in the case at bar to excuse appellant's failure to communicate with her daughter."

## IV.

Abandonment has been established by clear and convincing evidence. It only remains to inquire whether termination of father's parental rights over Kathie would be in her best interest. Clearly this is so.

Kathie was abandoned by her mother and left with DSS in January, 1980. At that time she was withdrawn, suffering from hysterical blindness and given to violent, frustrated actions arising out of her mother's rejection.

After being placed with foster parents Kathie's hysterical blindness disappeared in two months. Kathie's attitude has improved dramatically. Last year she was voted the most improved student in her school, progressing from a "D" student to an "A–B" student.

Kathie and her foster parents have great mutual love for each other. The foster parents, who greatly impressed this judge, want very much to adopt her. They have provided Kathie with a super abundance of love.

Kathie refers to her foster parents as "Mom and Dad". She loves them and wants to make her home with them. She does not know father or his wife. She has no interest in knowing or living with them. She fears the loss of her home with her foster parents. She told this judge that she wants to remain with her family consisting of her foster parents and three foster brothers. So it shall be.

Kathie has known many years of rejection and unhappiness. If she has not been abused she certainly has been neglected. Conditions were once so bad that she was afflicted with hysterical blindness. The love and care that she has received from the foster parents has minimized if not obliterated Kathie's past misery. She has now found a home and family. The Court would not be justified in tampering with this child's new found happiness in order to satisfy the vague notions entertained by father that Kathie should be with him and that bloodlines are all important. After all, father has not seen Kathie for almost nine years, since she was eighteen months old. This man even testified that his interests are paramount to Kathie's interests.

The evidence is clear and convincing that it is in Kathie's best interest that all parental rights over her be terminated so that she can be adopted by her foster parents. Therefore, an order will issue terminating the remaining parental rights over Kathie.