**ADOPTIVE PARENTS of M.L.V. and A.L.V., Appellants (Defendants Below),**

v.

**Mark WILKENS, Appellee (Plaintiff Below).**

No. 82S05–9209–JV–673.

Supreme Court of Indiana.

Sept. 4, 1992.

Marilyn R. Ratliff, John E. Hegeman, Kahn, Dees, Donovan & Kahn, Evansville, for appellants.

Katherine J. Rybak, Legal Services Organization, Evansville, Kenneth Falk, Legal Services Organization, Indianapolis, for appellee.

SHEPARD, Chief Justice.

The apparent father of the children who are the subjects of this proceeding asked that they be adopted and executed the necessary consents. After the children were adopted, he sought to set the adoption aside. We hold that he has no standing to do so and affirm the constitutionality of our statute so providing.

The adoptive parents bring this interlocutory appeal from the trial court's denial of their motion to dismiss a complaint brought against them by appellee Mark Wilkens, putative biological father of their adopted children. The adoptive parents contend Wilkens lacked standing to bring the action and that the court should have dismissed. The Court of Appeals affirmed. *Van Hoose and Adoptive Parents v. Wilkens,* 588 N.E.2d 604 (Ind.App.1992). We grant transfer.

## I. Facts

The facts as alleged in the pleadings are as follows. Dierdre Vierra, an unmarried adult, gave birth to two children, one born in 1985 and one born in 1986. Wilkens claims to be their father, and this claim is not disputed. He lived with the children and the mother from the time the children were born until December 1987. At this time, Vierra and Wilkens placed the children for adoption through Rick and Nancy Van Hoose of Greater Love Adoption Decision, Inc. (GLAD), a licensed child placement agency. Vierra and Wilkens executed consents to the termination of their parental rights and to the adoption of the children. They waived notice of all future adoption proceedings. Record at 2–13, Exhibit A to *Agreed Statement of Matters.* Wilkens now alleges the Van Hooses told him he could visit the children after the adoption and says he would not have consented to the adoption otherwise.

The adoption consent form signed by Wilkens clearly stated he acknowledged and understood he was permanently relinquishing any rights to custody, control or visitation of the children. Similarly, the form he signed consenting to the termination of parental rights also declared that any rights to custody, control or visitation are permanently terminated when a court terminates the parent-child relationship.

On December 15, 1987, GLAD filed petitions to terminate the parental rights relative to both children and the consents executed by Wilkens and Vierra. The court granted GLAD immediate custody of the children for the purpose of adoptive placement, and it appointed GLAD temporary guardian. On December 21, 1987, the children were placed with the adoptive parents, where they remain today. In January 1988, the trial court held a hearing on the petitions to terminate parental rights. Wilkens asserts that just prior to this hearing Nancy Van Hoose told him not to mention the visitation agreement to the judge because it would delay the proceedings. Wilkens appeared at this hearing, but said nothing about having an interest in visitation. The court found that the consents of Vierra and Wilkens were properly signed and ordered an order terminating parental rights. The adoptive parents filed a petition for adoption in March 1988, and the court entered a final order granting the adoption in January 1989.[1]

1. The adoptions were entered separately under two cause numbers, consolidated for purposes of appeal. We refer to both adoptions as "the adoption."

Prior to the adoption, Wilkens applied for dependent social security benefits on behalf of the children as their biological father, and the benefits were awarded. While the adoption was pending, Wilkens visited the children several times in the Van Hoose home. He also visited the children once during the summer after the adoption was final. When he spoke with the Van Hooses in the fall of 1989 to learn the children's clothing sizes so he could purchase gifts for his holiday visit, he was informed that the adoptive parents would no longer permit the visits.

In May 1990, Wilkens brought a complaint against GLAD, the Van Hooses, and the adoptive parents. He alleged misrepresentation by the Van Hooses prior to the execution of his consents, saying he never would have consented to the adoption had he realized he would not have visitation rights. He sought rescission of the termination of his parental rights, rescission of the adoption, and custody of the children or, alternatively, visitation with them. He sought damages for the loss of the love, affection and services of the children. The adoptive parents moved for dismissal and the trial court denied the motion. None of the other parties or claims are part of this appeal.

## II. Standard of Review

The adoptive parents moved for dismissal pursuant to Ind. Trial Rule 12(B)(6), arguing Wilkens failed to state a claim upon which relief can be granted. A complaint is subject to dismissal under this rule if "it appears to a certainty that plaintiff would not be entitled to relief under any set of facts." *Martin v. Shea* (1984), Ind., 463 N.E.2d 1092, 1093. For purposes of the motion to dismiss, the facts alleged in the complaint are taken as true. *Thiele v. Indiana Dept. of Highways* (1985), Ind. App., 472 N.E.2d 1274.

## III. Adoption Statute

The adoption statute creates a statutory proceeding unknown at common law. Because it is in derogation of the common law, we long ago held it must be strictly construed in favor of the rights of the natural parents. *Emmons v. Dinelli* (1956), 235 Ind. 249, 133 N.E.2d 56. That is, it must be "strictly followed in all essential particulars." *In re Adoption of Subzda* (1990), Ind.App., 562 N.E.2d 745, 748. Today, it seems apparent that careful administration of the statute serves purposes beyond protecting the rights of natural parents to be with their children. It also serves to protect the children and to shield all involved parties from unnecessary instability and uncertainty.

The portion of the statute at issue in this case provides in pertinent part: "[A] petition to adopt a child under eighteen (18) years of age may be granted only if written consent to adoption has been executed by the mother of a child born out of wedlock and the father of such a child *whose paternity has been established by a court proceeding other than the adoption proceeding.*" Ind.Code Ann. § 31–3–1–6(a)(2) (West Supp.1991) (emphasis added). The General Assembly emphasizes its seriousness about the paternity determination by reiterating this requirement in the same section. *See* Ind.Code Ann. § 31–3–1–6(g)(2)(A) (consent to adoption not required from natural father of child born out of wedlock whose paternity has not been established by court proceeding other than adoption proceeding).

The parties agree that Wilkens' paternity has not been established in a court proceeding other than the adoption proceedings. *See Agreed Statement of Matters.* The only proceedings that occurred were the termination of parental rights hearing and the adoption proceedings. The termination hearing was held only as a part of the adoption proceedings. The order terminating parental rights notes and approves Wilkens' consent to the adoption. Vierra and Wilkens executed their consents to termination and adoption on the same day. The fact that the termination hearing was held a month before the adoption petitions were filed does not turn the termination hearing into a separate proceeding.

 Because Wilkens was not a father whose paternity was established by a sepa-

rate court proceeding, his consent was not necessary for the adoption. Ind.Code Ann. § 31–3–1–6(a)(2). *See In re M.B.H.* (1991), Ind.App., 571 N.E.2d 1283 (putative father must clearly establish paternity in another action before intervening in adoption proceedings); *Matter of Adoption of Baby Boy Dzurovcak* (1990), Ind.App., 556 N.E.2d 951 (putative father must demonstrate he established paternity in separate proceeding prior to having power to veto adoption); *M.R. by Ratliff v. Meltzer* (1986), Ind.App., 487 N.E.2d 836, (putative father's consent to adoption unnecessary because his paternity had not been established in court). Only the mother's consent was needed; there is no dispute about the validity of the mother's consent. She is not a party to this action.

Wilkens had ample time to establish his paternity, and it would not have been a difficult process. The putative father may unilaterally petition to establish paternity. Ind.Code Ann. § 31–6–6.1–2 (West Supp. 1991).[2] From the record before us, it appears that Wilkens would have been the presumed biological father of the children. *See* Ind.Code Ann. § 31–6–6.1–9 (West Supp.1991). Because he did not establish paternity in a separate proceeding, however, Wilkens' consent was not needed for the adoption and he cannot now contest it.

## IV. Fraud Claim

■ Wilkens alleges that his consents were obtained by fraud because the Van Hooses told him he would have visitation after the adoption. A consent obtained by fraud is no consent at all, he continues, and thus he can challenge the adoption. Because Wilkens' consent was unnecessary to the adoption, however, whether an unnecessary consent was fraudulently obtained or not is irrelevant to the adoption decision.

Indiana Code § 31–3–1–6(f) states: "A consent to adoption may not be withdrawn after the entry of the decree of adoption." Caselaw has indicated that fraud may be a reason for setting aside an adoption despite the clear language of the statute; these cases, however, deal with a person whose consent was required for the adoption. *See, e.g., Emmons*, 235 Ind. 249, 133 N.E.2d 56, (natural mother); *Matter of Adoption of Topel* (1991), Ind.App., 571 N.E.2d 1295 (father of child conceived during marriage); *Matter of Adoption of Hewitt* (1979), Ind.App., 396 N.E.2d 938 (natural mother). Wilkens is not a member of this class, and these cases do not help him.[3]

The Court of Appeals noted that but for the fraud, Wilkens could have established his paternity in a separate proceeding and his consent then would have been required for the adoption. Wilkens does not allege, however, the adoptive parents or the Van Hooses did anything to discourage him from filing a paternity action. He simply states the Van Hooses told him he could visit the children after the adoption was final, and that he would not have consented to the adoption without such a promise. We conclude Wilkens cannot, under any set of facts, obtain a reversal of the adoption based upon fraud.[4]

2. Wilkens was not unaware of the possibility of filing a paternity action; he asserts in his brief to the Court of Appeals that he consulted an attorney about establishing paternity and signed a petition to establish paternity but did not follow through because he could not afford to pay his attorney.

3. Wilkens argues that even if his consent was not required, when an adoption is obtained based upon the putative father's consent the consent must be valid in order for the adoption to be valid. He cites *Caley v. Lung* (1971), 257 Ind. 116, 271 N.E.2d 891, for this proposition. In *Caley*, the natural mother of the child attempted to set aside an adoption on the basis that her consent to the adoption was obtained by fraud. The court stated: "Consent of the natural mother had been obtained. It follows, therefore, that such consent must be valid." *Id.* at 118, 271 N.E.2d at 892. The natural mother's consent was necessary to the adoption. This case cannot stand for the idea that an unnecessary consent becomes necessary simply because it was obtained.

4. Wilkens requests in the alternative that the trial court grant him visitation rights. We note that natural parents have no rights to visitation with children after the children have been adopted. *See* Ind.Code Ann. § 31–3–1–9 (West 1979) (natural parents of adopted person are divested of all rights with respect to such person).

■ We also find that the adoptive parents did nothing which makes them liable for damages under a claim of fraud. To maintain an action for fraud, there must be a material misrepresentation of past or existing fact made with knowledge of or reckless disregard for the falsity of the statement, and the misrepresentation must be relied upon to the detriment of the relying party. *American Independent Management Systems, Inc., v. McDaniel* (1982), Ind.App., 443 N.E.2d 98. *See also Edwards v. Hudson* (1938), 214 Ind. 120, 122, 14 N.E.2d 705, 706 ("The essential elements of actionable fraud are representations, falsity, scienter, deception and injury.").

■ Wilkens' sole allegation of fraud against the adoptive parents is that they allowed him to visit the children a few times before and once after the adoption was final, thereby encouraging him to believe he would be able to visit the children as the Van Hooses had told him. These visits occurred *after* Wilkens executed his consent to the adoption, and therefore they have no bearing on its legitimacy. At the time of Wilkens' consent, the adoptive parents had not done or said anything to him to induce him to consent to the adoption. Because Wilkens did not rely on the adoptive parents' actions, they were entitled to dismissal of his fraud claims against them.

### V. Equal Protection Claim

■ Wilkens argues the consent provision of the adoption statute violates equal protection because it allows an unwed mother to veto an adoption without doing anything other than giving birth, but requires unwed fathers to take some action to establish paternity in order to acquire the same veto.[5]

■ We note initially that statutes come to the Court cloaked with a presumption of constitutionality. *Eddy v. McGinnis* (1988), Ind., 523 N.E.2d 737. The burden is on the challenger to overcome this presumption.

The U.S. Supreme Court dealt with gender distinctions for unwed parents in the adoption setting in *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). The Court found a New York statute violated equal protection when it permitted an unwed mother to veto an adoption by withholding her consent but required an unwed father to show an adoption would not be in the child's best interest to prevent the adoption. A New York unwed father apparently had no way to obtain veto power over the adoption of his child. The Indiana statute does provide unwed fathers with a way to obtain this veto power, and we must determine whether this consent scheme for unwed parents violates equal protection.

■ "Gender-based distinctions 'must serve governmental objectives and must be substantially related to achievement of those objectives' in order to withstand judicial scrutiny under the Equal Protection Clause." *Id.* at 388, 99 S.Ct. at 1766 (quoting *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976)). The objectives of the adoption statute include the placement of unwanted and/or mistreated children with families who will care for them. *See Emmons,* 235 Ind. 249, 133 N.E.2d 56 (object of adoption statute is to give unfortunate children without home and parental care the benefits of home and care). Another goal of the statute is to promote permanency and stability. This state's policy in favor of permanency is demonstrated by the prohibition against the withdrawal of consent after an adoption is final. *See* Ind.Code Ann. § 31–3–1–6(f) (West Supp.1991). Permanency and stability are very important, especially for young children who may have already lived in many different homes.[6] These objectives all work toward the best interests of the child, which is the primary concern in an adoption proceeding. *B.G. v. H.S.* (1987), Ind.App., 509 N.E.2d 214, 217.

The statute also seeks to protect the interests of natural parents. The parental consent provision furthers this purpose by

---

5. *See* Ind.Code Ann. § 31–3–1–6.

6. For a discussion of the child's need for permanency and stability, see Joseph Goldstein et al., *Beyond the Best Interests of the Child* (1973).

requiring that biological parents willing to give their children to others for adoption consent in writing to the action. Because it is more difficult to identify a biological father than a biological mother, our statute requires that biological fathers take some action to demonstrate their paternity. This reduces the possibility of one man consenting to an adoption, and then after the adoption is granted another man showing up to establish paternity and complain that a man who had not established paternity consented to the adoption of his child.[7]

There are other differences in the legal treatment of mothers and putative fathers. Because it is generally not difficult to determine the biological mother of a child, a mother's legal obligations to her child arise when she gives birth. It is more difficult, however, to determine the biological father. Therefore, when the parents are not married and the state has not already imposed a contract on the two parents, a man alleged to be the father of a child is not automatically required to support the child simply because someone says he is the father. The mother or the state must establish legal paternity to obtain support from an unwed father. Given the biological differences between mothers and fathers, the legal differences between unwed mothers and unwed fathers, and the purposes of the adoption statute, we conclude that equal protection will tolerate Indiana's differential treatment of unwed parents in the adoption setting.

The case law of the U.S. Supreme Court suggests some distinction between unwed fathers who are active parents and those who are not.[8] A statutory scheme based on this distinction could require consent from unwed fathers who have participated in the upbringing of the child and not require it from those who have not. This, however, would cause litigation of the wrong question in an adoption proceeding. Before a court could decide who was required to consent to the adoption and before the court would reach the basic question of whether or not the child should be adopted, the court would have to determine "how good an unwed father" someone has been.[9] Our legislature has not chosen such a scheme, and we conclude it is not constitutionally mandated. Such a scheme would not promote our adoption statute's purposes and goals.

The distinction between unwed mothers and unwed fathers is substantially related to achievement of the governmental objectives of placing unwanted children, promoting stability and permanency, and protecting the rights of natural parents. The burden on unwed fathers to establish formal paternity is modest. The consent provision of our adoption statute does not violate equal protection.

### Conclusion

The trial court erred in denying the adoptive parents' motion to dismiss. We reverse the judgment of the trial court, and remand with instructions to grant the adoptive parents' motion to dismiss Wilkens' claims against them.

DeBRULER, DICKSON and KRAHULIK, JJ., concur.

GIVAN, J., votes to deny transfer.

---

**7.** Such possibilities are hardly hypothetical. *See In re Paternity of S.R.I.* (1992), Ind.App., 588 N.E.2d 1278 (putative biological father files paternity action after apparent parents divorce and decree sets obligations for "their" child), *transfer pending.*

**8.** In *Caban,* 441 U.S. 380, 99 S.Ct. 1760, the U.S. Supreme Court noted that where the father has never participated in the rearing of his child, equal protection does not preclude the state from withholding from him the privilege of vetoing the child's adoption. In *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614

(1983), a case involving notice to putative fathers of adoption proceedings, the Court noted a distinction between parents who have established a custodial relationship with the child and those who have not. *See also Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).

**9.** For an example of such a statutory scheme and the litigation it has spawned, see N.Y.Dom. Rel.Law § 111(d), (e) (McKinney 1988) and Supplementary Practice Commentaries in McKinney Supp.1992.