**FOR PUBLICATION**



ATTORNEY FOR APPELLANTS:

**ROBIN R. CRAIG**
Evansville, Indiana

ATTORNEY FOR APPELLEES:

**MATTHEW W. LUTZ**
Fox & Lutz, LLC
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ADOPTION OF M.H. )
)
W.M. & S.K., )
)
    Appellants, )    No. 82A01-1310-AD-449
)
        vs. )
)
N.B. & R.B., )
)
    Appellees. )

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett Niemeier, Judge
Cause No. 82D07-1205-AD-00068

**August 19, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

W.M. and S.K. (collectively, the "Appellants") appeal the trial court's order denying their petition for adoption of M.H. and granting the petition for adoption filed by R.B. and N.B. The Appellants raise two issues which we revise and restate as:

I.  Whether the trial court erred by denying the Appellants' Motion to Recuse after receiving an *ex parte* communication from the judge's fraternity brother urging the judge to rule in a particular manner on the day of the adoption trial; and

II.  Whether the trial court erred in finding that it was in the best interest of M.H. to be adopted by the Appellees.

We affirm.

## FACTS AND PROCEDURAL HISTORY

M.H. was born on April 9, 2012, to H.H. ("Mother"), with an unknown father. Mother tested positive for cocaine, opiates, and THC at the time of M.H.'s birth, and M.H. tested positive for cocaine and THC. On April 12, 2012, a CHINS petition was filed on M.H. and the baby was placed in a foster home.

The Appellees are licensed foster parents who reside in Evansville, Indiana. N.B. operates an in-home licensed daycare, with an average of four to six children present each day. R.B. is a retired law enforcement officer who was employed at Markham Security in May 2012 and at Volunteers of America in May 2013. The Appellees both have college educations. N.B. was born in December 1962, and R.B. was born in February 1961. The Appellees were married on October 10, 2007. R.B. has no biological children of his own. N.B. has three biological children of her own living in the marital residence. In addition, the Appellees have adopted five children. Three of these children are biological half-siblings to

2

M.H. and one is biologically a maternal cousin to M.H. In addition to their biological children, adopted children, other foster children living in the residence, and day care children, over the course of the last five years the Appellees have had approximately twenty-five different foster children living in their home.

Appellant W.M. was born in December 1950 and is the maternal great aunt of Mother. W.M. is unmarried and resides alone in Boonville, Indiana, in a four bedroom house. Appellant S.K. is the adult daughter of W.M., is unmarried, and resides in Evansville, Indiana, with her two children, ages ten and eleven.

On May 4, 2012, the Appellees filed a Motion for Placement. On May 9, 2012, W.M. requested placement of M.H. On May 10, 2012, the Appellees filed their Petition for Adoption, and on June 1, 2012, W.M. filed a Petition for Adoption with the consent of the biological mother. On June 1, 2012, the trial court held a CHINS hearing in a separate cause and ordered split custody placement of M.H. between the Appellees and W.M. On August 30, 2012, the Appellants filed an amended joint petition to adopt, and their case was consolidated with the Appellees' case by the trial court. On January 16, 2013, the Vanderburgh Superior Court terminated the biological mother's parental rights.

At some point, DCS recommended the Appellants as the adoptive family.[1] The court

---

[1] Our review of the record on appeal reveals that it does not contain direct evidence regarding DCS's recommendation that the Appellants be allowed to adopt M.H. The transcript contained in the record consists of two volumes. The first volume is titled "Transcript of portions of the hearings held May 30, 2013 and August 13, 2013," and we refer to this volume as "Transcript." The second volume is titled "**Addendum** Transcript of portions of the hearing held August 22, 2013." Thus, it appears that only a portion of the testimony presented at the adoption hearing was transcribed.

We note, however, that the court in its order finds that DCS recommended that the Appellants be

heard evidence concerning the petitions to adopt on May 30, 2013, August 13, 2013, and August 20, 2013. During the presentation of evidence on May 30, 2013, upon returning from lunch, Judge Brett Niemeier advised the parties that he had received an email from his fraternity brother, Mark Schultz. The email message was dated May 30, 2013 at 8:03 a.m. and stated:

> Hi Brett, I wanted to drop you a quick e-mail on a hearing you have today for a child adoption situation. My daughter – Brittany Deer sent you an e-mail last week [o]n behalf of [N.B.]. I think the world of [N.B.] and [R.B.] we have been friends for 10 years and she was the babysitter for both of my step children.
> You could not find a couple that cares for children like [N.B.] and [R.B.]. On their behalf I am sending you my support for them.
> Take care Brett and hope to see you at the Picnic.
> Respectfully, Mark.

Appellants' Appendix at 31.

Judge Niemeier represented that he did not read all of the email but that he read enough to know that it supported the Appellees on their adoption petition. The Judge indicated that he was told by counsel that Schultz's daughter had also emailed the Judge a week prior about the adoption matter. Judge Niemeier noted that he and Schultz "were fraternity members for about a year and a half in the 80s," that he could not think of the last time he saw Schultz, and that [o]ur fraternity has an annual picnic, so I see him . . . I don't know if I saw him last year or if it was two years ago . . . ." Transcript at 67. The Judge gave the Appellants an opportunity to discuss with their counsel whether they wanted to make a

---

allowed to adopt M.H. Also, we note that during the testimony of Laura Ellsworth, a therapist called as an expert witness by the Appellees, the Appellees' counsel asked the question "[a]re you aware that DCS is recommending the [Appellants] as the adoptive family," to which Ellsworth responded: "[The Appellees] did

motion to remove him. The Judge advised the Appellees' attorney that they can make a motion too if they wanted but that he did not think the issue pertained to them because the email favored the Appellees.

After discussing with counsel, the Appellants concluded that if they "received a decision that they could not live with in this case, they would always wonder if it was because . . . there was pressure by friends or acquaintances to rule one way or the other. And they would also wonder whether or not that had an impact." Id. at 68-69. The Appellants then moved to have a neutral judge appointed to hear the case. The court denied the Appellants' motion.

In June 2013, one of the Appellees' children was believed to have cancer, requiring that their full attention and finances be directed towards that child. During this time the Appellees did not see M.H. and were unsure whether they would be able to continue to pursue the adoption due to the circumstances. The Appellees gave a letter to the Appellants instructing them not to return M.H. to their residence any longer and that they had made a decision that it was in the best interests of their family to not follow through with the adoption. The Appellees indicated in the letter that they desired to work out an agreement to have visitation with M.H. at some point in the future, and they asserted that M.H. would resent the Appellants for removing her from the household of her siblings and would eventually come join their family when she was an adult. The Appellees also had each of the children write letters to M.H. and W.M. and later gave them to W.M. The letters were

indicate that, yes." Transcript at 9.

5

handwritten in crayon and contained statements such as "shame on you," "you better be happy you made kids and adults cry and cry! I dispise [sic] you!," and "[s]he deserves the world since you are taking her from her siblings." Appellants' Exhibits 10-A through 10-G.

The Appellants had M.H. exclusively after June 24, 2013. On July 22, 2013, the Appellees filed a Motion to Resume Court Ordered Placement Schedule, referring to the parenting time schedule that was reached in the CHINS case. In the CHINS proceeding, at one of the progress hearings, the Appellees appeared and requested the Court to reinstate the prior visitation schedule. The court was advised of the Appellees' letter and that in accordance with their letter, no parenting time had taken place since June 24, 2013. The court denied the Appellees' request to re-implement the prior schedule.

The adoption proceedings continued on August 13, 2013, and August 20, 2013. On October 13, 2013, the court issued its order (the "Order") granting the adoption to the Appellees, and ordering the Appellants to part with M.H., which was later extended to October 15, 2013, at the request of DCS. In addition to reciting findings consistent with the above, the Order states as follows:

> FAMILY TIES: . . . . There was great emphasis, especially from the DCS, that [the Appellants'] family relationship was the leading factor for them to believe it was in [M.H.]'s best interest to be adopted by [them]. The Court is unconvinced that the factor of being distantly related should be given significant weight. Clearly under DCS policy and some state law relatives are given preference when looking at placement or possible adoption of a child, but there is a limit to this factor. This case is an example of why there are limits to this factor. . . . The relatives that are closest to [M.H.]'s age that would see her regularly [in the Appellants' household] are approximately eight years older than her and are [W.M.'s] grandsons. One DCS case manager claimed that this family relationship was the only factor for her recommendation. She claimed she totally discounted [W.M.'s] age or health

and the possibility of [M.H.] having to be raised by [S.K.] as factors. . . .

The [Appellees] have adopted three of [M.H.]'s half siblings, [D.] age 6, [C.] age 4 and [E.] age 2.  All of these children are younger than any other relative that [M.H.] would be growing up with and [D.], [C.] and [E.] are far more closely related to [M.H.] than any other child or adult associated with [W.M.].  The state appears to make light of this fact by claiming that [W.M.] has stated that she will allow for contact between the siblings so breaking this sibling bond shouldn't be an issue.  The Court believes that having some type of contact is a far cry from being raised with your siblings.  The state was also afraid the [Appellees] would not allow contact with the [Appellants] family, even though the [Appellees] expressed that they would.  The Court agrees that the [Appellees] are less likely to allow contact, but the [Appellees] reasoning for questioning how much visitation should be expected is sound.  The [Appellees] have three other siblings of [M.H.] who do not know these distant relatives.  It would be extraordinary for third cousins to have visitation rights to a child.  Indiana law only recognizes parents and grandparents having visitation rights.  If [W.M.] had been a great, grandmother this relationship would have had more significance, but that is simply not the case.  This added responsibility expected by the DCS on the [Appellees] is not reasonable in light of the [Appellees] large family and the distant connection.  Lastly, the [Appellees] also have adopted a first cousin of [M.H.], which is another relative for [M.H.] to have a bond with.

On this factor, based upon the above reasoning, the Court believes that the sibling relationships and their significance strongly favor the [Appellees] to be able to adopt.  Of course, the Court's examination does not end here.

FINANCIAL AND HOME ENVIRONMENT:   [W.M.] lives alone in Boonville, Indiana approximately 20-30 minutes away from Evansville and 45 minutes away from the [Appellees].  She works full time and must rely on a babysitter.  The child care provider appears to be a wonderful asset.  [She] is 62 years young.  She is one of the sweetest people that a person could know.  She brings gifts to [M.H.] and her half siblings even though the [Appellees] restrict her access.  She even stated she brings bananas for the family as a treat when others are getting presents.  [W.M.] is the grandmother that every child should have.  Even though her appearance is that of someone who is frail, [she sits slightly stooped over and is extremely thin] [she] does quite well for herself.  She is independent and works long hard hours and hopes to work until she is seventy.  [W.M.] loves [M.H.] beyond comparison.  [She] does have some arthritis problems, but does well with [M.H.] now.  Due to [W.M.'s] age and thus potential health problems, her daughter [S.K.] joined in the adoption

7

petition and sat next to their attorney during trial, instead of [W.M.]. Clearly, joining the petition was done knowing that [M.H.] might need another home or parent before [M.H.] reaches the age of 18, when she could be on her own. [W.M.] will be 79 years old when [M.H.] turns 18. [S.K.], who lives and works in Evansville, is only 33 and has two boys, both approximately 10 and 11 years older than [M.H.]. There is no doubt that [M.H.] would be loved and raised appropriately by [the Appellants]. They understand the importance of education, church, family and being loved. They have the financial means and resources to care for [M.H.]. There was no evidence presented which would indicate that [W.M.] raised her daughter inappropriately. No one in the family has a history with the DCS and nobody has a criminal record. [M.H.] would be an only child to [W.M.] so she would receive a lot of undivided attention. On the negative side of things; [W.M.] is sixty years older than [M.H.] and even in today's world [] that is an extraordinary age difference between a parent and their child. This huge disparity in age can make it more difficult to parent especially when the child becomes a teenager. Even though [W.M.] has [S.K.] as a back-up it is not the best situation when a family has to plan for somebody else to maybe parent a child for health reasons or even worse and [S.K.] lives in a different city. This issue gets more troubling when one considers that [M.H.] will come to realize one day that she is adopted and could have to deal with abandonment issues.

The [Appellees] have eight children living in their home. There will be little undivided attention from the parents compared to what she would receive by [W.M.]. The children are split up into groups for their bedrooms. The children have to sit at separate tables due to the amount of people in the family. Unfortunately the adopted kids are the youngest so they are at one table. This division might not be the best from a psychological standpoint, but it is not unlike a lot of families with a lot of kids or that have family reunions where the younger kids are kept together. The house itself is adequate. [R.B.] has had a couple of significant heart problems, especially for his age. The problems appear to have been treated, but overall [R.B.'s] health is a huge concern. The [Appellee's] family has no DCS or criminal history. There was no evidence to suggest that any of their kids have not been raised properly. [R.B.] is a former police officer and now works at a work release facility. While evidence was presented to show that [N.B.] overdrew her checking account there was no other evidence that the [Appellees] couldn't financially be able to raise [M.H.]. Tax returns were introduced to imply that the [Appellees] needed money or were unethical, but no tax expert testified that the returns were incorrect. Further, no evidence was presented that the [Appellees] had been audited by the IRS[.] Clearly [S.K.] thought the [Appellees] simply wanted [M.H.] as another tax deduction. She was very

8

bitter and did not spare her words. The Court was disturbed by [N.B's] testimony that financial considerations played a part in writing the letter which asked to drop the adoption, but the Court recognizes that thousands of dollars in attorney fees can have significant long lasting impact on families. Long term though, there is no indication that the [Appellees] cannot afford to raise [M.H.]. There was also testimony concerning the [Appellees] accepting government assistance and informing [S.K.] that she should seek this type of assistance. . . . [S.K.] was clearly biased. She appeared to be a wonderful asset to help with [M.H.], but she was convinced the [Appellees] were just interested in making money off of the kids. Her testimony had little or no significance with the Court as one could also argue that if the [Appellees] didn't accept legal assistance that would be a disservice to their children; again, no person testified that the [Appellees] were doing anything illegal or improper. Further, nothing in the [Appellees] past would suggest that they are the type of people to live off the government on welfare. [N.B.] operates a small daycare facility and [R.B.] is a former police officer and still works today in the criminal justice system. While the [Appellants] clearly thought the [Appellees] were adopting just because they received assistance, there was no evidence presented which could lead one to believe that the [Appellees'] children were not being raised appropriately or that the children were not properly dressed, nourished, or being treated as well as their own children; further all the children are involved in age appropriate activities. . . . Without real evidence that the [Appellees] were somehow not providing for their adoptive kids or are wasting money by taking lavish trips or buying expensive cars, etc., this court will not assume that people are in it for the money when they simply accept the assistance that the government provides. . . . The Court believes that all of the petitioners have an adequate home and resources to raise [M.H.]. . . . [I]t is hard to imagine that a child wouldn't want to grow up with a lot of kids around, especially their brothers and sisters. Through a child's eyes the [Appellees] home would be the more attractive place to be raised. The Court believes the home environment slightly favors the [Appellees].

ATTACHMENT: The most remarkable and troubling aspect of this case is when the [Appellees] decided to temporarily stop pursuing this adoption. First, by the [Appellees] discontinuing the adoption fight it leads one to question how much love they truly have for [M.H.]. More than once the [Appellees] stated they were doing the adoption for the kids, especially [M.H.]'s siblings. This type of phrasing added to the impression that [M.H.] isn't loved. Clearly, the [Appellants'] family loves [M.H.]; they shed a lot of tears on the witness stand. Their demeanors clearly showed how devoted they were to [M.H.]. The [Appellees] were much more stoic. This could have been

their personalities, especially R.B. who is a former police officer, but it was troubling. This Court does not believe anyone could fully appreciate all the factors that the [Appellees] had to be weighing during this incredibly stressful time for their family, when they temporarily dropped their fight to adopt. Time, energy, money, and heartache all converged and the [Appellees] made a decision that can be seconded [sic] guessed by anybody. The fact that the tumor was not cancerous also puts a strange twist to the issue. One would think that upon finding this out a deep sigh of relief would occur, but that does not appear to be the case here. The pressure clearly continued and the decision to stop the adoption was made. The Court believes in some cases that this decision alone would be dispositive of the case, but adoption cases cannot simply be determined by who the Court believes most loves the child. Nobody can truly measure how much a person loves another. Love can be expressed in many ways and even if a Court could determine who loves [M.H.] more that doesn't mean that this person is the best parent for a child. The [Appellees], while doing something that this Court could never fully comprehend, still changed their mind and pursued this adoption after reexamining their circumstances. The Court believes that the [Appellees] made a terrible decision, but the Court cannot rule that this decision automatically disqualifies them from being granted the right to adopt in this case. The Court believes that the [Appellees] do love [M.H.], but clearly the attachment/caring factor favors the [Appellants].

OTHER CONSIDERATIONS: The [Appellees] showed extremely poor parenting skills by allowing the children to write notes to [W.M.]. Further their own letter was done in extremely poor taste. Clearly, the [Appellees] strongly dislike the [Appellants'] family and vice versa. . . . Unfortunately, neither side can understand the others' positions. . . . This Court understands that when people are at odds against each other over somebody that they deeply love they will not always treat each other the best. This does not make them bad people or bad parents. Due to the [Appellees'] dislike of the situation, they did not act appropriate at times and on the one occasion horrible things were written. In a strange way this extreme behavior shows how passionate the [Appellees] can be concerning [M.H.] and supports the Court's belief that they truly do love her. Likewise the horrible letters also show how much the entire family loves [M.H.]. Conversely, the letters make[] one wonder how good the [Appellees'] overall parenting skills are. To have children write these letters and then to give them to [W.M.] is a horrible act and uncalled for. . . . This behavior cast doubt whether they are the best parents to raise [M.H.], but it does not show that overall [] they are bad parents. Nothing else suggest [sic] that they don't do a great job with their kids. The circumstances surrounding the treatment of the [Appellants],

including the letters strongly favor the [Appellants].

* * * * *

CONCLUSION: Ultimately this Court must decide what is in [M.H.]'s best interest. This determination must take into account all the evidence and factors presented to the Court and after weighing all of these factors the Court finds that it is in [M.H.]'s best interest for the [Appellees] to adopt. Many factors go into this decision but the Court cannot overlook that the [Appellees'] family is closer in age, bigger in numbers and should last longer without interruption compared to the [Appellants]. There was a half day of testimony from Laura Ellsworth concerning the [Appellees] home and the value of a sibling bond. Quite frankly, this testimony did not impact this Court's decision, as like most people, the Court already knows the importance of a sibling bond. . . . Unfortunately, in this case the DCS wanted to desperately continue a family connection and the importance of the sibling bond becomes secondary. It appeared to the Court that the DCS decided this case more on the possibility of who would allow visitation instead of who was actually best to raise the child. Their determination was unreasonable in this case. [M.H.]'s most immediate family is her half-siblings. They are extremely close her [sic] age to her. She should be raised with her siblings and not a distant cousin or great, great aunt. [M.H.] not having her siblings in her life could be very detrimental to her emotionally, but not having a third cousin in her life should not affect her in any way. The other factors in this case were also very important, especially the [Appellees] temporarily deciding to end their adoption fight, but there was no evidence presented which showed that either family wouldn't be able to successfully raise [M.H.] in a safe, secure, child friendly environment with love all around her. . . . The Court hopes the [Appellees] will allows some form of contact with the [Appellants], but will not order said contact. . . .

Appellants' Appendix at 12-17.

DISCUSSION

I.

The first issue is whether the trial court abused its discretion by denying the Appellants' Motion to Recuse. A ruling upon a motion to recuse rests within the sound discretion of the trial judge and will be reversed only upon a showing of abuse of that

11

discretion. Bloomington Magazine, Inc. v. Kiang, 961 N.E.2d 61, 63 (Ind. Ct. App. 2012). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. Id. at 63-64. When reviewing a trial judge's decision not to disqualify himself, we presume that the trial judge is unbiased. Id. at 64. "In order to overcome that presumption, the appellant must demonstrate actual personal bias." Id. In addition, the mere appearance of bias and partiality may require recusal if an objective person, knowledgeable of all the circumstances, would have a rational basis for doubting the judge's impartiality. Id. Upon review of a judge's failure to recuse, we will assume that a judge would have complied with the obligation to recuse had there been any reasonable question concerning impartiality, unless we discern circumstances which support a contrary conclusion. Id.

The Appellants argue that the trial court erred in denying their Motion to Recuse after Judge Niemeier received a personal email from his fraternity brother, who was associated with the Appellees, urging the Judge to rule for them. They argue that the denial of the Motion to Recuse was contrary to Rules 1.2, 2.4, 2.9, and 2.11 of the Code of Judicial Conduct, and it created the appearance of impropriety, and failed to promote public confidence in the independence, integrity, and impartiality of the judiciary. The Appellants cite to a discussion penned by Chief Justice Shepard regarding the case of Tyson v. State, 622 N.E.2d 457 (Ind. 1993). The Appellants argue that Tyson is instructive of the standard that should be observed in considering recusal when impartiality may be questioned when it states "[t]he question is not whether the judge's impartiality is impaired in fact, but whether there

12

exists a reasonable basis for questioning the judge's impartiality." Appellants' Reply Brief at 3 (quoting Tyson, 622 N.E.2d at 459).

The Appellees contend that the Appellants failed to show any bias such that the trial court's decision was based on anything other than the evidence presented which the trial court's findings support. They argue that although the court received an unsolicited email from an acquaintance of thirty years ago, that email had no bearing upon the court's decision. The Appellees maintain that in order for the Appellants to show bias or prejudice requiring the judge to recuse himself, they must show that the court must have relied upon the email in making its decision, making fair judgment impossible, and that no objective person understanding all of the circumstances would have a basis for doubting the judge's impartiality.

We begin by observing that the Appellants do not cite to the relevant rule regarding judicial recusal, Ind. Trial Rule 79(C), which provides:

> A judge shall disqualify and recuse whenever the judge, the judge's spouse, a person within the third degree of relationship to either of them, the spouse of such a person, or a person residing in the judge's household:
>
> (1) is a party to the proceeding, or an officer, director or trustee of a party;
>
> (2) is acting as a lawyer in the proceeding;
>
> (3) is known by the judge to have an interest that could be substantially affected by the proceeding; or
>
> (4) is associated with the pending litigation in such fashion as to require disqualification under the *Code of Judicial Conduct* or otherwise.

To the extent the Appellants cite to the Code of Judicial Conduct, we note that Ind.

13

Judicial Conduct Rule 2.9(B) states as follows:

> If a judge inadvertently receives an unauthorized ex parte communication bearing upon the substance of a matter, the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond.

Here, Judge Niemeier fully complied with this Rule. After receiving an email from Schultz during court recess, and immediately upon reconvening, Judge Niemeier notified the parties of the substance of the communication and provided the parties with an opportunity to respond. The Judge specifically stated as follows:

> There was . . . when I was opening up my emails, one of the emails came that I did not . . . well, I started reading it and then I stopped reading. And I don't know if I read the entire first sentence or the first sentence and the first half of the second sentence. I don't know. I wasn't paying really close attention. But I did give a copy to Counsel and it was somebody who's name is Mr. Schultz, Mark Schultz. And he emailed me about today's hearing and said that he "just wanted to tell me . . ." and then I was like uh oh, and I quit reading. Whenever . . . I literally saw your names, the [Appellees].
>
> \* \* \* \* \*
>
> So what you all need to do, because I know it was supporting the [Appellees], you need to feel free to read it, talk to your attorney. [sic] and if she wants to make a motion which would remove me as Judge, you're entitled to make that motion. If she makes that motion, then I'll decide if I'm going to or not. But she certainly is entitled to make that motion. And if you don't want to, then obviously that's also your right. If you make the motion and I decline, [sic] that is in absolutely no way going to affect what would happen in the case. So you all . . . I'll give you about five or ten minutes to decide if you're going to make any motions.

Transcript at 66-68.

To the extent that the Appellants assert that Judge Niemeier did not remain impartial in this case, we note that Ind. Judicial Conduct Rule 2.11 governs the disqualification of

14

judges and provides in part:

> (A)   A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned, including but not limited to the following circumstances:
>
>> (1)   The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge* of facts that are in dispute in the proceeding. . . .

Rule 2.11 contains the following comments:

> [1]   Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply. In many jurisdictions, the term "recusal" is used interchangeably with the term "disqualification."
>
> [2]   A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed.
>
> * * * * *
>
> [5]   A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification.

Ind. Code of Judicial Conduct Rule 2.11 cmt. 1-2, 5.

"A judge is presumed unbiased and unprejudiced, and to rebut the presumption, the defendant must establish from the judge's conduct actual bias or prejudice which places the defendant in jeopardy. Such bias or prejudice exists only where there is an undisputed claim or where the judge has expressed an opinion on the merits of the pending controversy." Cook v. State, 612 N.E.2d 1085, 1088 (Ind. Ct. App. 1993). "Adverse rulings . . . do not support a claim of bias." Id.

15

On this score, we find particularly relevant Judge Niemeier's statements about his relationship with Schultz:

> Mr. Schultz and I . . . I'm trying to think of the last time I saw Mark. We were fraternity members for about a year and a half in the 80s. Our fraternity has an annual picnic, so I see him . . . I don't know if I saw him last year or if it was two years ago was the last time I saw him. Never had dinner with him. Never talked to him. Never emailed him. Never nothing, Okay? The reason why he has my email is because all fraternity members have each other's emails. And at times we will send out these mass emails, for instance, announcing our annual picnic, which is coming up I think in probably July or August. I don't know when it is. But something like that. So that's how he got my email.

> * * * * *

> I don't feel that I'm going to be biased or prejudiced or pressured or anything just simply because I just . . . not that I didn't know Mark Schultz 30 years ago, but I mean, quite frankly what he says has absolutely zero meaning to me in this case, or quite frankly about anything he would tell me. I mean, I just don't know him, you know. It would be totally different if I had dinner with him sometime in the last couple of years or a socialized [sic] or knew his family. But I just don't know anything about Mark anymore, other than he was a fraternity member years and years ago. I don't know if this makes you . . . feel any better, but I mean, most of the witnesses that are called, not obviously the [Appellees], or you all, because I don't know you, but most of the witnesses that are called in trials . . . and I don't even know who the witnesses will be called in this case for or against, but I probably know most of them. I just do. And it's just simply because they appear in court a lot and I take testimony from them. And I don't socialize, I don't do anything like that with them. So I kind of look at it somewhat like that is that I have no doubt that I can be fair and decide based purely on what's said here. Obviously if I get any other emails, I clearly will let parties know and I will try not to open them before [sic] I get them.

Transcript at 67, 70-71.

Simply, the Appellants have not overcome the presumption that Judge Niemeier acted impartially. He received an email from an acquaintance of decades earlier, and he promptly disclosed receiving the email. He noted that he did not read the entire email but that he read

16

enough to know which party the email favored. In ruling on the Appellants' Motion to Recuse, Judge Niemeier gave a thorough explanation of his level of association with Schultz, how Schultz had access to his email address, and the credence he gave to Schultz's opinion on the merits of the case before him, which he termed "absolutely zero." Id. at 70. Further, the Judge's decision recited in the Order reflects a thorough, unbiased consideration of all the evidence before him. We therefore conclude that the court did not abuse its discretion when it denied the Appellants' Motion to Recuse.

II.

The second issue is whether the trial court erred in finding that it was in the best interest of M.H. to be adopted by the Appellees. "When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." In re Adoption of T.L., 4 N.E.3d 658, 662 (Ind. 2014). We presume the trial court's decision is correct. Id. We will not reweigh the evidence, but instead will examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. In re Adoption of K.S., 980 N.E.2d 385, 387 (Ind. Ct. App. 2012). The decision of the trial court is presumed to be correct, and it is the appellant's burden to overcome that presumption. Id.

When, as in this case, the trial court has made findings of fact and conclusions of thereon, we apply a two-tiered standard of review: "we must first determine whether the evidence supports the findings and second, whether the findings support the judgment." In re

17

Adoption of T.W., 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006); see also Ind. Trial Rule 52(A) (providing that where the trial court has made findings of fact and conclusions of law, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"). Factual findings "are clearly erroneous if the record lacks any evidence or reasonable inferences to support them [and] . . . a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings." T.W., 859 N.E.2d at 1217.

The Appellants raise a number of challenges to the court's findings. The Appellants first challenge the court's findings related to the relative ages and health of the competing parties, arguing specifically that "the undisputed evidence regarding the health of the parties supported a finding that the [Appellees'] health was a significant impediment to their raising of M.H." Appellants' Brief at 19. We observe, however, that the court recognized explicitly that "[R.B.] has had a couple of significant heart problems, especially for his age" and that although "[t]he problems appear to have been treated . . . [R.B.'s] health is a huge concern." Appellants' Appendix at 14. Thus, the court entered specific findings recognizing the health concerns related to the Appellees.

Next, the Appellants challenge the court's finding related to the financial ability of the Appellees to support M.H., arguing that the children qualify for free lunches, free books, WIC, and Medicaid, that N.B. participates in the government day care food reimbursement program, and that the Appellees repeatedly bounce checks from their bank account. They

18

maintain that, by contrast, W.M. "has a retirement plan with her employer and she participates in her company 401k plan" and "has been working and paying into Social Security since [she] was age 36 through 62 . . . ." Appellants' Brief at 22.

Again, the findings contained in the Order account for the evidence to which the Appellants direct our attention. The court found that "[w]hile evidence was presented to show that [N.B.] overdrew her checking account there was no other evidence that the [Appellees] couldn't financially be able to raise [M.H.]." Appellants' Appendix at 14. The court also found that "[t]here was also testimony concerning the [Appellees] accepting government assistance," but it noted that "without real evidence that the Appellees were somehow not providing for their adoptive kids or are wasting money by taking lavish trips or buying expensive cars, etc., this Court will not assume that people are in it for the money when they simply accept the assistance that the government provides." Id. at 14-15. Additionally, the court found that "nothing in the [Appellees'] past would suggest that they are the type of people to live off the government on welfare," that "[N.B.] operates a small daycare facility and [R.B.] is a former police officer and still works today in the criminal justice system," and that "there was no evidence presented which could lead one to believe that the [Appellees'] children were not being raised appropriately or that the children were not properly dressed, nourished, or being treated as well as their own children; further all the children are involved in age appropriate activities." Id. at 14.

The Appellants also challenge the court's finding related to the Appellees' use of their adopted children for financial gain and to commit adoption credit tax fraud, arguing that "the

evidence established the undisputed fact that the [Appellees] claims [sic] adoption credits more than double the amount they actually incurred to gain a larger refund from the government." Appellants' Brief at 24. The court in its Order recognized explicitly that "[t]ax returns were introduced to imply that the Appellees needed money or were unethical, but no tax expert testified that the returns were incorrect. Further, no evidence was presented that the [Appellees] had been audited by the IRS." Appellants' Appendix at 14. The court further stated that it "is aware that some foster parents have a reputation that they are just in it for the money," but "there was no evidence that these kids were not properly being cared for or that there was a lack of love and affection in the home." Id. at 15. Thus, the court considered the evidence related to the tax issue raised by the Appellants, and we cannot say that the evidence does not support such findings.

The final challenge the Appellants raise regarding the court's findings is that the court failed to make a finding recognizing a maternal bond between M.H. and W.M. They assert there was evidence presented at the adoption hearing that "M.H. began to call W.M. 'Mommy'" and that "[o]n some occasions in the morning, M.H. does not want to let go of W.M." and "[s]he grabs a hold of her and doesn't want to let go." Appellants' Brief at 24. We note, however, that the court in considering what it termed "[a]ttachment" found that "[c]learly, the [Appellants'] family loves [M.H.]; they shed a lot of tears on the witness stand. Their demeanors clearly showed how devoted they were to [M.H.]." Appellants' Appendix at 15. The court went on to find that while the court believes that the "[Appellees] do love [M.H.] . . . *clearly the attachment/caring factor favors the [Appellants]*." Id. (emphasis

20

added). Thus, the court considered the evidence presented regarding attachment between M.H. and both the Appellants and the Appellees, and it specifically determined that such evidence favored the Appellants.

To the extent that the Appellants challenge the court's conclusion that it is in M.H.'s best interest to be adopted by the Appellees, we observe that the Indiana Supreme Court has held that the best interests of the child is the primary concern in an adoption proceeding. Adoptive Parents of M.L.V. v. Wilkens, 598 N.E.2d 1054, 1058 (Ind. 1992); see also In re Adoption of S.A., 918 N.E.2d 736, 742 (Ind. Ct. App. 2009) ("[T]he best interest of the child is the paramount concern in any adoption case."), trans. denied. The adoption statute does not provide guidance for which factors to consider when determining the best interests of a child in an adoption proceeding, but we have noted that there are strong similarities between the adoption statute and the termination of parental rights statute in this respect. See In re Adoption of M.L., 973 N.E.2d 1216, 1223 (Ind. Ct. App. 2012) (holding that the adoption statutes and the termination statutes provide similar balances between parental rights and the best interests of the children). In termination cases, we have held that the trial court is required to look to the totality of the evidence to determine the best interests of a child. In re I.A., 903 N.E.2d 146, 155 (Ind. Ct. App. 2009). Here the Appellants have the burden of overcoming the presumption that the trial court's decision is correct. S.A., 918 N.E.2d at 745. Again, we will reverse the trial court only if the evidence leads to but one conclusion and the trial court reached the opposite conclusion. T.L., 4 N.E.3d at 662.

The Appellants assert that the court's conclusion that it was in M.H's best interest to

21

be adopted by the Appellees was based on the fact that the Appellees had previously adopted M.H.'s three siblings and a cousin of M.H., and they argue that a number of the court's findings are contrary to this conclusion. The Appellants recite a number of the court's findings for this proposition, including that DCS recommended the Appellants adopt M.H., that the Appellants would encourage contact between M.H. and her siblings while the Appellees were not amicable to allowing contact between M.H. and the Appellants, that W.M. is a sweet person, that there is no doubt M.H. would be loved and raised appropriately by the Appellants, that M.H. would receive little undivided attention at the Appellees' residence, that M.H. would be sharing a room with three other girls, that the younger children eat dinner at a separate table, and that the Appellees at one point stopped pursuing M.H.'s adoption. The Appellants also note that the court found the Appellants shed tears on the witness stand and that the Appellees were more stoic in their emotions, and also that the Appellees exhibited poor parenting skills when they allowed their children to write mean-spirited goodbye letters and passed them to the Appellants.

Thus, the crux of the Appellants' argument is that they would provide a better home for M.H. However, we cannot say their arguments demonstrate that the Appellees could not also provide a safe, secure, stable, and appropriate home and family life for her, and at most they have merely shown that either home would be appropriate. Indeed, the Appellants' arguments essentially ask that we reweigh the evidence and find in their favor, which we cannot do. K.S., 980 N.E.2d at 387 ("We will not reweigh the evidence, but instead will examine the evidence most favorable to the trial court's decision together with reasonable

inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision."). We also note that, although the fact that the Appellees had previously adopted three siblings and one cousin of M.H. played a substantial role in the court's conclusion, it was not the sole basis for its decision. The court also highlighted aspects of the [Appellees'] household including that, regardless of the blood-relation aspect between the adopted children, there were other children present who were closer in age, and that the family was "bigger in numbers and should last longer without interruption compared to the [Appellants]." Appellants' Appendix at 16.

The court stated in its conclusion that "there was no evidence presented which showed that either family wouldn't be able to successfully raise [M.H.] in a safe, secure, child friendly environment with love all around her." Id. After our review, we cannot say that the evidence presented leads only to the opposite conclusion. We therefore conclude that the court's Order was not clearly erroneous.

Finally, we note our agreement with the trial court that the circumstances of this case are unfortunate and can be made worse were the Appellees to follow through on their statements to deny the Appellants a chance at having a relationship with M.H. W.M. has played an important role in M.H.'s formative years, and she clearly treasures her relationship with M.H. Although we acknowledge that it is beyond the scope of this court's authority to mandate visitation between the Appellants and M.H., we echo the trial court's words of encouragement that, as the stress and anger associated with litigation recede, the Appellees will allow for some degree of contact between them.

## CONCLUSION

For the foregoing reasons, we affirm the court's Order granting the Appellees' petition to adopt M.H.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.