## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 25 2020, 9:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEY FOR APPELLEE

Ralph E. Dowling
Dowling Law Office
Muncie, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Adoption of
P.B. and K.B.:

T.B.,

*Appellant-Respondent,*

v.

E.S.,

*Appellee-Petitioner*

March 25, 2020

Court of Appeals Case No.
19A-AD-2448

Appeal from the Delaware Circuit Court

The Honorable Mary G. Willis, Senior Judge

Trial Court Cause Nos.
18C01-1807-AD-85
18C01-1807-AD-86

**Baker, Judge.**

[1] T.B. (Father) and E.S. (Mother) are the parents of two children. They separated in 2015 and Mother got married in 2018. Her new wife filed a petition to adopt the children. The trial court found that Father's consent was not required because he had failed without justifiable cause to communicate with the children for at least one year. It also found that the adoption was in the children's best interests. Father argues that both conclusions are erroneous. He also argues that his due process rights were violated because one judge presided over a discovery hearing while a different judge presided over the evidentiary hearings. Finding no due process violation and no other errors, we affirm.

## Facts

[2] Mother and Father are the parents of P.B., born in March 2012, and K.B., born in January 2015 (collectively, the Children). Mother and Father were never married but were in a relationship from 2008 through 2015, living together intermittently. Father signed paternity affidavits for both children but has never opened a paternity case to establish child support or parenting time.

[3] Mother testified that the last time Father spent time with P.B. in person was in October 2016, and the last time he saw K.B. was sometime before that.[1]

---

[1] The trial court found that the last time Father saw the Children was in November 2015, but Mother clearly testified that it was October 2016. Tr. Vol. II p. 81. We note that we understand the trial court's confusion, as the witnesses' testimony was generally muddled regarding dates and facts. This discrepancy does not change the outcome.

According to Father, he had not seen either child in person since March 2017 and had last seen one of them by video in May 2017. Since then, Father has not tried to communicate or arrange a visit with the Children.

[4] The relationship between Father and Mother was an extremely violent one, both before and after their separation. For example, he once punched her in the face and broke her jaw in four places; he once woke her with a punch in the face, kept punching, pulled her hair, and threw her on the floor outside a sleeping P.B.'s room, pointed a B.B. gun at her eye, and asked which eye she wanted to lose; and once, he strangled her and told her that, if asked about the bruises, she was to say she had fallen down the stairs. In December 2015, Father chased Mother at high speed, intentionally crashing his car into the car in which she was riding. He knew that both children were in the car, and he hit the car right next to where P.B. was sitting. On another occasion, Father followed Mother around town until she made a sudden turn to evade him, causing him to miss the driveway she turned into; angry, he pointed a gun at her out of his window.

[5] In addition to the physical violence, Father regularly threatened and harassed Mother. He has repeatedly threatened to kill and harm her over the years. He called Mother sixty-seven times in one weekend and has gone to her workplace. He stole her license plate, taunted her about it, and then returned it.

[6] After Father broke her jaw, Mother filed a protective order against Father. It was granted ex parte, and he did not request a hearing even though it prevented

him from communicating with both her and the Children. When that protective order lapsed, Mother sought another one after he broke the window in the Children's bedroom and harassed her over the phone. All told, there were four protective orders in place from 2014 through 2019.

[7] Mother testified that since the 2015 separation, Father has given her a total of $40 in child support and told Mother she had to pay him back. He has made no other payments over the years and has never given the Children any gifts. He does not even know the year in which P.B. was born. Father testified that he had given Mother a total of $375 over the years in child support. He admitted that he "always had a job" after the separation, tr. vol. II p. 179, had lived with his mother rent-free for five years, had purchased three cars over the years, of which he owned one at the time of the final hearing, and was able to buy gas and his own clothes. Indeed, he drove enough to accumulate eight arrests for driving with a suspended license, pleading guilty to one of those charges.

[8] In January 2017, E.S. became romantically involved with T.S. (Adoptive Mother) (collectively, the Mothers). At some point, Adoptive Mother moved in with Mother and the Children, and since that time, the Mothers have raised the Children together. The Mothers got married in June 2018. Both women are employed and support the Children financially and emotionally. The Children are healthy, current on medical care, and doing well in school. The Mothers have substantial family in the area who are active in the Children's lives and support the family. Adoptive Mother's life revolves around the Children. The family unit is bonded, happy, and thriving.

[9]     On July 20, 2018, Adoptive Mother filed petitions to adopt the Children. Mother consented to the adoptions; Father did not. Adoptive Mother argued that his consent was not necessary because he had failed, without justification, to communicate with the Children for at least one year and/or because he had failed to provide for the care and support of the Children when able to do so.

[10]    The parties engaged in discovery. Mother filed a motion to compel regarding incomplete and missing interrogatory responses from Father. On February 11, 2019, Judge Marianne Vorhees presided over the Discovery Hearing.

[11]    An evidentiary hearing regarding the necessity, or lack thereof, of Father's consent to the adoption took place on February 25, 2019. Senior Judge Mary Willis presided over the evidentiary hearing and took the matter under advisement. On March 25, 2019, the trial court entered an order finding that Father's consent to the adoptions was not necessary because he had failed, without justification, to communicate significantly with the Children when able to do so for at least one year. After Father's unsuccessful attempt to file an interlocutory appeal of that order, the trial court held a final hearing on September 20, 2019. Senior Judge Willis again presided over the final hearing, which focused on the Children's best interests. The same day, the trial court entered orders granting both adoptions. Father now appeals.

# Discussion and Decision

# I. Due Process

[12] First, Father argues that his due process rights were violated because different judges presided over the final three hearings. He directs our attention to *Farner v. Farner*, in which this Court noted that if evidence is heard by a trial judge who thereafter dies or resigns from office before making findings or ruling on the evidence, the "general rule in such case is that a successor judge may not make findings of fact or conclusions of law without a trial *de novo*." 480 N.E.2d 251, 257 (Ind. Ct. App. 1985).

[13] The situation described in *Farner* is completely different than the situation in this case. Here, Judge Vorhees presided over a hearing related to discovery. That hearing did not address the issue of Father's consent or the merits of the adoption petition. Senior Judge Willis oversaw both evidentiary hearings related to the substantive issues—first, she presided over the evidentiary hearing related to Father's consent; and second, she presided over the final hearing related to the issue of the Children's best interests. Because the same judge presided over both evidentiary hearings, we find that Father's due process rights were not violated.

# II. Adoption

[14] Next, Father argues that the trial court erred by (1) finding that his consent to the adoptions is not required; and (2) finding that the adoption is in the Children's best interests. When reviewing the trial court's ruling in an adoption

proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial court reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). We presume the trial court's decision is correct, and it is the appellant's burden to overcome that presumption. *In re Adoption of M.H.*, 15 N.E.3d 612, 625 (Ind. Ct. App. 2014). We will not reweigh the evidence and will instead focus only on the evidence most favorable to the trial court's decision together with the reasonable inferences that may be drawn therefrom. *Id.*

## A. Consent

[15] Indiana Code section 31-19-9-8 provides that consent to an adoption is not required from, in relevant part, a parent of a child in the custody of another person if, for a period of at least one year, the parent "fails without justifiable cause to communicate significantly with the child when able to do so[.]" I.C. § 31-19-9-8(a)(2)(A).[2]

[16] The trial court credited Mother's testimony over Father's regarding the date of his last visit with the Children. Specifically, it found that "November 30, 2015 is the last date that the Father saw his children in person or had contact with

---

[2] The next subpart of that section states that consent is likewise not required from a parent who knowingly failed to provide for the care and support of the child when able to do so. I.C. § 31-19-9-8(a)(2)(B). The two subsections are phrased in the disjunctive, meaning that both need not be proved by the adoption petitioner. Therefore, while Father raises arguments regarding his financial support of the Children, we need not consider these because we find that the trial court properly concluded that his consent is not required due to a lack of communication. Regardless, we note that even if his testimony is credited, the sum total of his contributions over three years totals $375, which is not meaningful financial support.

them. Father alleges that he saw his children in 2016[3] but cannot establish a date or location." Appellant's App. Vol. III p. 57. Father's arguments to the contrary amount to a request that we reweigh the evidence and reassess witness credibility, which we may not do. It was within the trial court's discretion to believe Mother over Father, and it did not err by doing so.

[17] That said, we note that Father's own testimony is that the last time he communicated in any way with the children was in May 2017, over one year before Adoptive Mother filed the adoption petitions in July 2018. Therefore, even if we were to credit Father's testimony, it would be to no avail.

[18] We note that there were protective orders in place that prevented Father from communicating with the Children. It could be argued (though he does not) that the protective orders constituted justifiable cause for the lack of contact.[4] In this case, however, we decline to make that finding for two reasons. First, Father never requested a hearing in the protective order cases to argue that he should be permitted contact with his Children.[5] Second, the protective orders clearly did not act as a barrier to his constant harassment of and threats to

---

[3] Again, we note some confusion with these dates. Mother testified that Father last saw P.B. in October 2016; Father testified that he last saw the Children in 2017. These discrepancies do not affect the outcome of this appeal.

[4] Obviously, it was Father's own violent behavior that led to the entry of the protective orders in the first place. This fact lends further credence to the conclusion that the protective orders did not constitute justifiable cause for the lack of communication.

[5] In fact, he testified that he did not read the protective orders and instead, upon learning what they were, told his mother to "throw [them] in the trash." Tr. Vol. II p. 151.

Mother, meaning that he was willing to expend considerable time and energy violating them to cause further trauma to her but not willing to fight them to be able to see his children. Under these circumstances, we do not find that the protective orders constituted justifiable cause for the lack of communication.

[19] In sum, we find that the trial court did not err by finding that Father's consent to the adoption was not required.

## B. Best Interests

[20] Finally, Father argues that the trial court erred by finding that the adoption is in the Children's best interests. Our Supreme Court has emphasized that the best interest of the child is the primary concern in any adoption case. *Adoptive Parents of M.L.V. v. Wilkens*, 598 N.E.2d 1054, 1058 (Ind. 1992). This Court has held that we should focus on the totality of the evidence to determine the best interests of the child in the context of adoption proceedings. *M.H.*, 15 N.E.3d at 627.

[21] In this case, we have little difficulty concluding that the trial court did not err by determining that adoption is in the Children's best interests. Father is a violent man who physically beat and emotionally terrorized Mother. *See In re E.M.*, 4 N.E.3d 636, 644-45 (Ind. 2014) (finding that even in the earliest phases of infant and toddler development, violence between parents can traumatize the children and change the neural pathways in their brain, causing symptoms akin to post-traumatic stress disorder). At times, his violence directly impacted the Children, including one occasion when he beat Mother outside of P.B.'s

bedroom door and another when he rammed his car into Mother's vehicle when he knew the Children were passengers. It is also apparent that over the years, while he has prioritized his campaign of terror against Mother, he has placed little to no value at all on his relationships with the Children. He has not seen or had any contact with them in years, nor has he provided any meaningful financial support. He did not even know the correct year of P.B.'s birth.

[22] In contrast, the Mothers have created a happy and healthy home for the Children. The Children are bonded to Adoptive Mother, whose life revolves around them. Their household and their community are stable and supportive, and the Children are thriving.

[23] Given this evidence, we find that the trial court did not err by concluding that adoption is in the Children's best interests.

[24] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.